Lake Forest, Inc. v. Commissioner.
Lake Forest, Inc. v. Commissioner
Docket Nos. 77061, 81891.
United States Tax Court
T.C. Memo 1963-39; 1963 Tax Ct. Memo LEXIS 305; 22 T.C.M. (CCH) 156; T.C.M. (RIA) 63039; February 13, 1963
*305 1. Except where section 302(b) of the Revenue Act of 1950 applies, exempt organization information returns are not "returns" for statute of limitations purposes under the 1939 Code. 2. Petitioner's claim to exemption under section 101(8), 1939 Code, failed because it was not a "social welfare organization." Held: section 302(b) of the Revenue Act of 1950 is inapplicable. 3. Petitioner, a cooperative housing corporation, held to have leased, not sold, its dwelling units to its members. 4. Held: petitioner's dwelling units were depreciable property in its hands, since it held them for the production of income. 5. Principal payments to petitioner by its members held: contributions to capital and not income to petitioner. 6. Patronage refunds qualifying as such under the tests in Pomeroy Cooperative Grain Co., 31 T.C. 674 (1958), affd. in part 288 F. 2d 326 (C.A. 8, 1961): (a) Need not be payable in cash; (b) May arise from additions to funded reserves for anticipated expenses; and (c) Need not, during the years before the Court, have been allocated by the due date of the payor's income tax return. 7. Additional state income taxes and interest due on account of any deficiency found here *306 are not deductible by petitioner, an accrual basis taxpayer, in the years to which the additional taxes relate. Globe Tool & Die Manufacturing Co., 32 T.C. 1139 (1959). 8. Petitioner's taxable status prior to the years before the Court held: the same as that determined for the years before the Court. A net operating loss incurred in the earlier period may be carried forward. Wallace C. Murchison, Esq., Carolina Power & Light Bldg., Wilmington, N.C., for the petitioner. Richard C. Forman, Esq., for the respondent. TRAIN
Supplemental Memorandum Findings of Fact and Opinion TRAIN, Judge: In 1961 we held petitioner exempt from Federal income taxation as a "social welfare" organization under sections 101(8) of the 1939 Code and 501(c)(4) of the 1954 Code., 36 T.C. 510. Petitioner's alternate contention, that it was exempt as a "like organization" under sections 101(10) of the 1939 Code and 501(c)(12) of the 1954 Code, was not reached by this Court. The mandate of the Court of Appeals for the Fourth Circuit reversed that decision and remanded for proceedings consistent with its opinion, reported at, 305 F. 2d 814 (1962). In the course of that opinion the Court of Appeals held petitioner *307 not exempt as a social welfare organization and stated "the argument for exemption of Lake Forest, Inc., as a 'like organization' * * * is altogether meritless." Id. at 820. We were directed to determine "the other issues presented by the petition of Lake Forest, Inc., and not reached by the Tax Court." Idem. The issues to be decided under that mandate are: (1) Whether the statute of limitations bars assessment of deficiencies for petitioner's taxable years 1948 through 1950; [1]
(2) Whether petitioner may deduct depreciation on certain buildings and equipment; (3) Whether the principal payments made to petitioner by its members under their mutual ownership contracts were capital contributions or income to petitioner; (4) Whether the book credits allocated by petitioner to its members for petitioner's taxable years 1955 and 1956 were properly excluded from gross income; (5) Whether the additional North Carolina income taxes and interest which would be owed for any year in issue for which a deficiency is determined in this proceeding are deductible for such year; and (6) Whether petitioner was exempt from taxation for the year of April 1, 1947, to March 31, 1948, and if not, whether *308 it sustained a net operating loss in such year which it may carry forward to subsequent years in issue. Findings of Fact Our findings of fact are set forth in 36 T.C. at 511-534. We will here make only those additional findings relevant to our decision in this proceeding. As in our earlier opinion, the Federal Public Housing Authority and its successor, the Public Housing Administration, will be referred to hereinafter as "PHA." Petitioner filed timely Form 990 exempt organization information returns for its taxable years 1948 through 1950. On September 18, 1952, petitioner filed Form 1120 corporate income tax returns for the period April 1, 1947 - June 30, 1948, and for its taxable years 1949 and 1950. Waivers of the statute of limitations for petitioner's taxable years 1948 through 1950 were first executed on June 20, 1955. The deficiency notice for those years was mailed on July 7, 1958, within the then currently effective extension of the waiver periods. Petitioner paid real estate taxes on the land, dwellings, and other buildings *309 in the project. Petitioner paid personal property taxes on the heaters, stoves, and refrigerators, among other things in those buildings. Petitioner's members did not pay such taxes on those items. A departing member who left before the end of petitioner's fiscal year did not accumulate book credits for that part of the year for which he was a member. If petitioner purchased the departing member's interest in petitioner and thereafter transferred it to a successor member, the successor accumulated book credits only for that part of the year during which the successor was a member. The book credits thus forfeited by the departing member were allocated to the remaining members. The purchase and sales contract between petitioner and the PHA provided for the interim period April 1, 1947 - March 31, 1948, in relevant part as follows: Article IV Interim Period. On April 1, 1947, and for the interim period between such date and either date of delivery of the conveyance documents or the termination of the Contract as herein provided prior to the delivery of such documents, the Corporation shall assume custody and possession of the project and undertake the administration, management, operation, *310 and maintenance of the Project. * * *
(d) Disposition of Revenue: The Corporation covenants that during the interim period all revenue from the Project in excess of amounts required to pay FPHA approved operation expense shall be deposited with the FPHA. Such deposits shall be made quarterly. At the time of the delivery of the conveyance documents, the FPHA shall apply such deposits against the payment of interest on the Purchase Price for the interim period at the rate of three and one-half per centum per annum (3 1/2%). The balance of such deposits, if any, shall then be applied to the credit of the Corporation on the unpaid balance of the Purchase Price. In no event shall such balance be credited against the portion of the Purchase Price required to be paid by the Corporation upon delivery of the conveyance documents. If for any reason this Contract is terminated prior to delivery of the conveyance documents, then in such event the amounts deposited with the FPHA pursuant to this section shall be retained by the FPHA as rental for the Project during the interim period. (e) Non-Accrual of Property Rights: The purposes of the foregoing provisions of this Article are to enable the Corporation *311 to obtain administration and management experience while developing its membership and perfecting its organization. Nothing in any of the foregoing provisions shall be construed as accruing or permitting or causing to accrue to the Corporation or to any of its members, any title, interest, equity, right or privilege in the Project. (f) Termination of Contract: If at any time during the interim period the FPHA shall determine that the Corporation for any reason cannot adequately administer, manage, operate or maintain the Project, then in such event the FPHA may terminate this Contract upon ten days written notice to the Corporation. The FPHA determination in this respect shall be final and binding on the Corporation. During the period April 1, 1947 - March 31, 1948, petitioner sustained a net operating loss of $5,540.09. Opinion Issue (1) - Statute of Limitations If the exempt organization information returns (Forms 990) filed by petitioner are returns for statute of limitations [2] purposes, then assessments of deficiencies for petitioner's taxable years 1948 through 1950 are barred. However, the statute has not run if the Form 1120's petitioner filed for those years in 1952 are the *312 operative returns. Petitioner maintains that the Form 990's it filed contain sufficient data to compute income taxes and are therefore returns for statute of limitations purposes. Alternatively, petitioner contends those Form 990's are to be treated as returns for such purposes under section 302(b) of the Revenue Act of 1950. [3] *313 Respondent views the Form 990's as inherently insufficient and maintains that section 302(b) of the Revenue Act of 1950 is inapplicable because exemption is denied here for reasons other than that petitioner was carrying on a trade or business for profit. We agree with respondent as to both the nature of Form 990's and the effect of section 302(b) of the Revenue Act of 1950. In Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 187-188 (1957), the Supreme Court met in the following manner the problem of Form 990's as returns for statute of limitations purposes: It is also argued that the Form 990 returns filed by the petitioner in compliance with § 54(f) of the 1939 Code, as amended, constituted the filing of returns for the purposes of § 275(a). But the Form 990 returns are merely information returns in furtherance of a congressional program to secure information useful in a determination whether legislation should be enacted to subject to taxation certain tax-exempt corporations competing with taxable corporations. [18] Those returns lack the *314 data necessary for the computation and assessment of deficiencies and are not therefore tax returns within the contemplation of § 275(a). Cf. Commissioner v. Lane-Wells Co., 321 U.S. 219. The Supreme Court's view of Congress' purpose in requiring many types of taxexempt organizations to file information returns is well-supported by the cited committee reports. When Congress intended to add to the functions of Form 990's that of serving as returns for statute of limitations purposes, it did so and indicated the limited circumstances in which this additional function would be present. See section 302(b), Revenue Act of 1950, supra; section 6501(g)(2) of the 1954 Code. [4] *315 On the basis of the cited committee reports and subsequent legislation [5] we conclude that the Supreme Court statement as to the limited purposes of Form 990's was an alternate holding or at least persuasive dictum. We hold that, except where Congress has provided otherwise, [6] returns filed under section 54(f) of the 1939 Code are inherently insufficient to constitute returns under section 275(a) of the 1939 Code. Perpetual Building & Loan Association of Columbia, 34 T.C. 694, 716 (1960), affd. sub nom. Cooper's Estate v. Commissioner, 291 F. 2d 831 (C.A. 4, 1961). See Southern Maryland Agricultural Fair Association, 40 B.T.A. 549, 553 (1939). We also agree with *316 respondent that petitioner's alternative reliance upon section 302(b) of the Revenue Act of 1950 is misplaced. By its terms, that provision applies only if petitioner would be exempt "were it not carrying on a trade or business for profit." We do not read the Court of Appeals' denial of exempt status to petitioner [7] *317 as being based solely upon a decision that petitioner was carrying on a trade or business for profit. Consequently, that provision is not applicable in this case. Stevens Bros. Foundation, Inc., 39 T.C. - (October 16, 1962). On this issue we hold for respondent. Issue (2) - Depreciation Respondent maintains that no deduction of depreciation is allowable to petitioner on account of dwellings and related stoves, refrigerators, heaters, and utility meters, it being his position "that petitioner had sold the dwellings and their appurtenances to its members under the mutual ownership contracts." Petitioner's depreciation deductions on account of building maintenance capital expenditures, motor scooters and automotive equipment, furniture and fixtures, a bus stop station, and a mowing machine are not disputed by respondent. Petitioner argues it owned the buildings and equipment it sought to depreciate, had capital invested therein, and used the buildings in its trade or business or held them for the production of income. [8] *318 It maintains that it leased rather than sold the property to its members. We agree with petitioner. Title to this property was conveyed to petitioner by an agency of the United States Government. There is no indication that petitioner, in turn, conveyed title to its members or anyone else (except to the PHA as security under its mortgage). Petitioner, not its members, paid the appropriate real estate and personal property taxes on the property involved in this issue. Although these formal matters are not conclusive as to ownership, nevertheless they are entitled to weight in the absence of supervening considerations. In this case, the other considerations convince us that the form accurately reflects the substance of petitioner's ownership of the property. Petitioner's members, in common with those of other housing cooperatives, are at the same time owners of petitioner and lessees of petitioner's property. Although petitioner's members may sometimes be treated, vis-a-vis outsiders, as "owners" of the housing units they occupy, [9] this characterization by other jurisdictions for other purposes is not determinative for Federal income tax purposes. *319 See Burnet v. Harmel, 287 U.S. 103, 110 (1932); North American Loan & Thrift Company, 39 T.C. - (November 2, 1962), and authorities cited therein at pp. 10 and 11. We are concerned with the meaning of the internal revenue laws and we may gather that meaning from what Congress has done, the explanations it gave for its acts, and the decisions of the courts regarding those acts. J. C. Penney Co., 37 T.C. 1013 (1962), affd., - F. 2d - (C.A. 2, December 12, 1962).
The decisions in Charles R. Holden, 27 B.T.A. 530 (1933) and Wood v. Rasquin, 21 F. Supp. 211 (E.D.N.Y., 1937), affd. per curiam 97 F. 2d 1023 (C.A. 2, 1938), [10] *320 disallowed deductions by cooperative housing corporation tenant-stockholders of mortgage interest and real estate taxes paid by the corporations. In response to the decision in Wood v. Rasquin (see Senate Finance Committee Hearings on Revenue Act of 1942, pp. 170, 172) the Senate inserted into the Revenue Act of 1942 a provision which became section 23(z) of the 1939 Code, allowing such deductions to tenant-stockholders of apartment housing cooperatives. The committee report (S. Rept. 1631, 77th Cong., 2d Sess., October 2, 1942, p. 51) states that "The bill provides for a new deduction in section 23(z) of taxes and interest paid or accrued by a tenant stockholder to a cooperative apartment corporation within the taxable year. * * * The general purpose of this provision is to place the tenant stockholders of a cooperative apartment in the same position as *321 the owner of a dwelling house so far as deductions for interest and taxes are concerned." The Senate provision was agreed to without change by the Conference Committee. H. Rep. 2586, 77th Cong., 2d Sess., October 19, 1942, p. 40. Section 318(a) of the Revenue Act of 1951 added section 112(n) to the 1939 Code deferring taxation on gain from a sale of one's principal dwelling, provided the taxpayer purchased another principal dwelling within one year from the sale. Section 112(n)(5) specifically provided that for purposes of that subsection stock in a cooperative apartment corporation would be treated as the equivalent of a residence provided that the seller or purchaser used the apartment which the stock entitled him to occupy as his principal residence. Section 23(z) of the 1939 Code was substantially re-enacted as section 216 of the 1954 Code, except that the favorable treatment accorded tenant-stockholders in cooperative apartment corporations was extended to tenant-stockholders "in a cooperative development of homes." H. Rept. 1337, 83d Cong., 2d Sess., March 9, 1954, p. 30; S. Rept. 1622, 83d Cong., 2d Sess., June 18, 1954, p. 36. Both committee reports (H. Rept., supra, p. A62; *322 S. Rept., supra, p. 221) characterized the section as re-enacting: in revised form, section 23(z) of the 1939 Code by allowing as a deduction not otherwise deductible to each stockholder an amount representing his proportionate share of the total amount of taxes and interest paid to a cooperative apartment corporation. The only substantive change is that the benefits of the section are also granted to stockholders of any cooperative housing corporation meeting the tests of the section. [Italics supplied.] Section 28 of the Revenue Act of 1962 amended section 216 of the 1954 Code by adding a provision permitting a tenant-stockholder of a cooperative housing corporation to treat some portion of his shares in the cooperative as depreciable property to the extent the tenant-stockholder's dwelling was used in his trade or business or for the production of income. This provision was added to the bill on the floor of the United States Senate. The following excerpts from the brief colloquy immediately preceding adoption of this provision are significant for our purposes: (108 Cong. Rec. 17300-17301 (daily ed. August 31, 1962)) Mr. SPARKMAN. Madam President, this amendment follows the policy *323 of section 216 of the Internal Revenue Code of 1954 that a tenant-stockholder of a cooperative housing corporation be treated in a manner consistent with that of the owner of improved real property. * * * As it stands now, persons who own apartments, we will say in a building that is condominium - Mr. DOUGLAS. The Puerto Rican system - horizontal slices of an apartment. Mr. SPARKMAN. That is correct. If a person rents out that kind of property, he can deduct depreciation and expenses, and so forth; but the person who owns almost the identical same thing in a cooperative housing [unit] cannot do that. This amendment puts those persons on a par with the others. * * *
Mr. JAVITS. This amendment, of course, seeks to take account of the legal form of organization which represents a proprietary lease and a stock interest, which is a quite usual form of organization, for example, in New York City, for cooperatives. * * * So what this amendment would do, as the Senator has explained in response to the Senator from Illinois, is treat property owners the same across the board, regardless of the form of legal organization of the cooperative, with respect to the availability of deductions for interest, *324 and so forth. * * *
Mr. SMATHERS. As I understand the amendment, it merely permits those persons who buy cooperative apartments and call them their homes to get the same advantage of the tax deduction for depreciation, and so forth, as people who own their own homes. Mr. KERR. In the event they rent them out. Mr. SPARKMAN. Yes; in the event they rent them out. It places all property ownership on the same level. Before, during, and after the years before us on this issue, Congress indicated its understanding that legislation is required in order to treat owner-lessees in housing cooperative corporations as owners of the units they have the right to occupy. [11] *325 Each such item of legislation granted such persons the beneficial tax incidents of owners for a limited purpose, i.e., deferral of gain on sale, deduction of taxes, mortgage interest, and depreciation. We agree with respondent's view that petitioner is a housing cooperative corporation and that its members are equivalent to stockholders for our purposes. See Rev. Rul. 55-316, 1955-1 C.B. 312. Our examination into the legislative history of the Code provisions specifically dealing with housing cooperative corporations leads us to agree with the following summary by the Commissioner of Internal Revenue, of existing law as it relates to depreciation deductions by cooperative housing corporations on account of dwelling units in those cooperatives: (1962-50 I.R.B. 46 (December 10, 1962)) Prior to this amendment, [section 28 of the Revenue Act of 1962] under section 216, [of the 1954 Code] a tenant-stockholder in a cooperative housing corporation was allowed a deduction for his share of the taxes and interest paid by the corporation but was not permitted any deduction for amortization or depreciation where the premises were used in a trade or business or for the production of income. This result was due to the fact that what he owned was merely stock in a corporation; he had no depreciable interest in the real estate and could not amortize *326 his right of tenancy as it is an integral part of the stock for which no separable basis could be ascribed. Our view of the law and the facts found in this case convince us that we must give effect to the form of ownership adopted by petitioner and its members with regard to the real property and associated equipment, depreciation of which is here at issue. Accordingly, we conclude that petitioner, and not its members, owns this property. Respondent points to the provision in paragraph TENTH of petitioner's amended charter (36 T.C. at 522) providing for conveyance to each member of his dwelling unit upon petitioner's liquidation. Respondent argues that "Dwelling tenants do not obtain title to their apartments just because their corporate landlord dissolves." Of course, title conveyance on dissolution is predicated here upon membership in petitioner and not merely upon tenancy. [12] Respondent is mistaken in his reliance upon that part of Rev. Rul. 55-316, supra, at 314-315, in which it is stated that "Perpetual use of and equity in an apartment or the proprietary lease of an apartment, *327 coupled with membership in the corporation, is the equivalent for practical purposes of ownership of an apartment." This statement is based upon the ruling's understanding that the 1942 Senate report, supra, on section 23(z) of the 1939 Code indicated that "The purpose of section 23(z) is to place the cooperative apartment owner in as favorable a position with respect to interest and taxes paid as the owner of a dwelling house." As we have seen, that committee report speaks of "the tenant stockholders of a cooperative apartment" rather than the owner of an apartment. This difference is crucial. In contradistinction to petitioner's relationship to the PHA on the mortgage, petitioner's holding of legal title vis-a-vis the occupants of the dwelling units, was not merely a security device (see E. J. Murray, 21 T.C. 1049 (1954), affd., 232 F. 2d 742 (C.A. 9, 1956); F. and R. Lazarus & Co., 32 B.T.A. 633, 634 (1935), affd., 101 F. 2d 728 (C.A. 6, 1939), affd., 308 U.S. 252 (1939)), but was the result of a deliberate choice by its member-tenants to conduct their affairs in the corporate form. Moline Properties Inc. v. Commissioner, 319 U.S. 436 (1943); National Carbide Corp. v. Commissioner, 336 U.S. 422 (1949). *328 Respondent seeks to draw support for his position from the enactments above referred to, designed to place cooperative tenant-stockholders in the same position as home owners. On the contrary, those provisions, carefully limited as to availability and effect, show rather Congress' understanding that otherwise cooperative tenant-stockholders would not be treated as home owners. Respondent maintains in the alternative that this property was neither used by petitioner in its trade or business (and suggests petitioner had no trade or business) nor held for the production of income. The income which respondent is seeking to tax in this proceeding was derived largely from petitioner's ownership, management, and rental of its real property. In the language of the statute, this is "property held for the production of income." Camp Wolters Enterprises, Inc., 22 T.C. 737 (1954), affd., 230 F. 2d 555 (C.A. 5, 1956), cited by respondent, is not relevant, since petitioner here held its realty for rent and not for sale to customers in the ordinary course of its business. Gladdings Dry Goods Co., 2 B.T.A. 336 (1925), also does not help respondent since it is petitioner's investment that is *329 here being recovered by petitioner via depreciation. Under the circumstances it is not necessary to decide whether petitioner was carrying on a trade or business within the meaning of this provision. Compare Magruder v. Washington, Baltimore and Annapolis Realty Corp., 316 U.S. 69 (1942), with Stafford Owners v. U.S., 69 Ct. Cl. 478, 39 F. 2d 743 (1930), both of which relate to "carrying on a trade or business" for purposes of the Federal capital stock excise tax. "Finally" respondent states on brief, "in addition to the foregoing, and probably most important of all," petitioner should not be allowed to deduct depreciation on the buildings because it may well result in allowing petitioner "to recover its costs more than once", i.e., by depreciation and by exclusion from income of its members' "principal payments." This argument will be discussed in issue (3), infra, relating to excludability of "principal payments." On the basis of our findings of fact (36 T.C. at 530-531) and the foregoing discussion, we conclude that this property is depreciable property held by petitioner for the production of income and that petitioner correctly determined the amounts of depreciation for each *330 of the taxable years before us. For treatment of depreciation allowable for petitioner's taxable years 1955 (last nine months) and 1956 see issue (4), infra. On this issue we hold for petitioner. Issue (3) - Principal Payments Petitioner excluded from income "principal payments" - the amounts paid by petitioner's members as their pro rata shares of petitioner's mortgage amortization obligations. In all but one of the taxable years before the Court these amounts were less than the amounts the petitioner actually paid that year in amortization of its mortgage. The nature of these principal payments is explained in our findings of fact at 36 T.C. 524-527. Respondent avers that if he prevails on the depreciation issue, contending that petitioner's members owned their dwelling units, then petitioner is entitled to exclude from income its mortgage amortization payments, in lieu of the lesser principal payments petitioner sought to exclude. However, if we find for petitioner on the depreciation issue, then respondent's alternate position is that the members must be considered as tenants and the principal payments constitute rental income to petitioner. Respondent argues that petitioner *331 may not claim the benefits of section 118 of the 1954 Code [13] and section 29.22(a)-16, Regs. 111, [14] *332 relating to capital contributions by stockholder, since "If petitioner's members were tenants, then the parallel [with corporate stockholders] could never exist. * * * Tenants pay for the use of their landlord's property. They do not own it." [Italics in original] Petitioner maintains that the principal payments were capital contributions and not income to petitioner and relies upon the code and regulations provisions deemed inapplicable by respondent. Petitioner sees no inconsistency between its position on this issue and its position on the depreciation issue. Petitioner declines with thanks respondent's offer to exclude the amount of petitioner's mortgage amortization payments, since "It is not the disbursement of the funds but their receipt as capital contributions which permits their exclusion from income." We agree with petitioner. Respondent's contentions, other than the allegation of inconsistency between allowing both depreciation deductions and the principal payment exclusions, were considered and rejected by this tribunal in Paducah & Illinois Railroad Co., 2 B.T.A. 1001 (1925); 874 Park Avenue Corporation, 23 B.T.A. 400 (1931); and Cambridge Apartment Building Corporation, 44 B.T.A. 617 (1941), *333 the latter two cases involving cooperative apartment house corporations. The Commissioner acquiesced in the decisions in all three cases. VII-1 C.B. 24; X-2 C.B. 21; 1941-2 C.B. 2. See I.T. 1469, I-2 C.B. 191 (1922). We have found that the principal payments were credited to an account entitled "Members Equities" and were so shown on petitioner's financial statements. Petitioner's members were advised of their principal payments and accumulated equities by published schedules and individual members' equity records. These payments were applied each year to amortization of petitioner's mortgage indebtedness to the United States., 36 T.C. at 525. These facts bring this case squarely within the above-cited decisions. Respondent has suggested no contrary authority and we have found none. Respondent replies, "It is irrational to believe that the two taxpayers, [in Park Avenue and Cambridge Apartment] while excluding mortgage payments from income, were at the same time being permitted to depreciate assets purchased with mortgage money." The short answer to this argument is that depreciation depends upon basis (section 167(q) of the 1954 Code; section 23(n) of the 1939 Code), which *334 in turn depends primarily upon cost (sections 1011, 1012 of the 1954 Code; sections 113(a, b), 114 of the 1939 Code), which does not normally and does not here depend upon whether the funds out of which the cost is paid constituted taxable income to the taxpayer. [15]
It seems clear that if petitioner's members had contributed the entire purchase price at the time petitioner bought the property from the United States Government, then petitioner could both exclude the contributions from income and deduct depreciation on the depreciable property purchased with such contributions. We fail to see a significant difference where petitioner's members make their capital contributions in installments instead of all *335 at once. We do not interpret any of the recently-decided cases dealing with whether certain payments by stockholders were contributions to capital or payments for services rendered or to be rendered, to require a different decision in this case. See Federal Employees' Distributing Co. v. United States, 206 F. Supp. 330 (S.D.Cal., 1962), on appeal C.A. 9. Cf. James Hotel Company, 39 T.C. 135 on appeal (C.A. 10, January 17, 1963); United Grocers, Ltd. v. United States, 308 F. 2d 634 (C.A. 9, 1962); Affiliated Government Employees' Distributing Co., 37 T.C. 909 (1962). Respondent's arguments regarding contingent reserve accounts and the repealed section 462 of the 1954 Code, prepaid or unearned income, the difference between prepaid rental and security deposits, and prohibition of methods of accounting which do not clearly reflect income are only vaguely relevant and are rendered immaterial by the statutory and case law hereinabove described as controlling in this area. On this issue we hold for petitioner. Issue (4) - Book Credits Under petitioner's amended charter and bylaws, after October 1, 1954, petitioner "treated as loans from members, for which they would be given credit *336 on the books at the end of the corporation's fiscal year" (36 T.C. at 528) each year's operating surplus and the annual additions to petitioner's reserve for repairs, replacements, and maintenance and petitioner's reserve for vacancies and collection losses. Petitioner included these "book credits" as expenses and deducted them from income. 36 T.C. at 529. Petitioner maintains that these amounts are patronage refunds, properly excludable from income. Respondent's view is that a housing cooperative may exclude a patronage refund only if the refund is made in the same taxable year of the cooperative in which the transactions occurred giving rise to the (Rev. Rul. 56-225, 1956-1 C.B. 58); "that none of them [the book credits] may actually be paid in cash to petitioner's members until petitioner has succeeded in extinguishing its complete mortgage indebtedness"; and that reserves for future, contingent expenses are not currently deductible. Cf. section 462 of the 1954 Code, repealed retroactively. Act of June 15, 1955, ch. 143, section 1(b), 69 Stat. 134. We agree with petitioner. Although section 522(b)(2) of the 1954 Code [16] *338 requires that patronage refunds of cooperatives exempt *337 under section 521 of the 1954 Code (dealing with certain farmers' cooperatives) be treated in the same manner as refunds by cooperatives not so exempt, the Code does not specifically authorize any deduction or exclusion on this account for nonexempt cooperatives. [17] However, the courts have approved and made a part of the law respondent's reasonably consistent practice of treating "true patronage dividends as corrective and deferred price adjustments, which serve to reduce the amount of the cooperative's gross profit from sales, and which actually never become part of its gross income." [Italics in original] Pomeroy Cooperative Grain Co., 31 T.C. 674, 686 (1958), affd. on this point, 288 F. 2d 326 (C.A. 8, 1961). In Pomeroy, we set forth three tests which must be met in order for an allocation to be a true patronage dividend: The allocation must have been made (1) pursuant to a pre-existing legal obligation, (2) out of profits realized from transactions with the particular patron for whose benefit the allocation was made, and (3) ratably among the patrons according to the particular types of transactions that gave rise to *339 the profits. We do not understand respondent to maintain that these criteria have not been met. Respondent's above-noted arguments do not destroy petitioner's exclusion from income under the Pomeroy tests. It is not relevant that the book credits may not be paid in cash until petitioner has extinguished its mortgage indebtedness. Farmers Cooperative Company v. Commissioner, 288 F. 2d 315, 318-324 (C.A. 8, 1961), reversing on another point, 33 T.C. 266 (1959). The Court of Appeals there notes, 288 F. 2d at 320) that although it agrees with the reasonableness of the Commissioner's contention that a cooperative's exclusion of patronage refunds from income should be geared to includibility in the income of the patron (with exceptions not here relevant), nevertheless, that is not how the law developed.[18]Long Poultry Farms v. Commissioner, 249 F. 2d 726, 731[19] *341 (C.A. 4, 1957); B. A. Carpenter, 20 T.C. 603, 607 (1953), affd., 219 F. 2d 635 (C.A. 5, 1955); Caswell's Estate v. Commissioner, 211 F. 2d 693 (C.A. 9, 1954); section 1.61-5(b)(iii), Income Tax Regs., amended by T.D. 6428, 1959-2 C.B. 26 to conform to the Long Poultry and Carpenter decisions. See United Control Corporation, 38 T.C. 957, *340 where we held that credit contract restrictions on payment by the taxpayer of officers' salaries did not prevent current deduction of liabilities for salaries. There it was likely that cash payments would eventually be made. Farmers Cooperative and the matters there cited make it clear that the likelihood of eventual cash payment is not a requisite for exclusion from income of cooperative patronage refunds. Respondent's argument that no deductions may be taken because of additions to reserves for estimated expenses (except, presumably, in the case of bad debts (section 166(c) of the 1954 Code)) is also not material, since petitioner here seeks exclusions from income, not on account of its additions to the reserves but rather on account of its allocations of the added amounts to its members. The tests we laid down in Pomeroy do not differentiate between operating surpluses and reserves for particular purposes. Also, Congress in 1951 seems clearly to have understood it to be law that allocations of such items might be the subject of patronage refunds. S. Rept. 781, 82d Cong., 1st Sess., September 18, 1951, p. 21. [20] The 1954 Code made no change in the patronage refund provisions. See footnote 16, $ supra. We gather from this that, during the years before us on this issue, there was no difference between the tax treatment *342 of patronage refund allocations out of operating surplus and similar allocations out of reserves for future contingencies. We are left with respondent's contention that his view is expressed in Rev. Rul. 56-225, supra, which reads as *343 follows: Where, in the case of a cooperative housing corporation, as defined in section 216(b)(1) of the Internal Revenue Code of 1954, predetermined carrying charges are collected from the tenant-stockholders in excess of the actual carrying charges paid or incurred by the corporation, any refund of such charges occurring in the same year merely results in a contra-adjustment and only the net amount of the carrying charges would be taken into the accounts of the corporation for Federal income tax purposes. However, where the excess of predetermined charges at the end of any year is not used to reduce carrying charges until a subsequent year or years, such excess constitutes income to the corporation subject to Federal income taxes in the year in which received. In Farmers Cooperative Co., 33 T.C. 266 (1959), we agreed with respondent that one necessary element of allocation of patronage refunds is disclosure to the patron of the dollar amount apportioned to him and that an exempt cooperative taxable under section 101(12)(B) of the 1939 Code may exclude only those patronage dividends it has allocated by the due date of its return - 8 1/2 months following the close of its taxable year. *344 We determined that Congress did not intend to allow to nonexempt cooperatives a privilege clearly denied to exempt cooperatives. We then concluded that since the taxpayer there (a nonexempt cooperative) had not disclosed to its patrons the dollar amount of their patronage refunds until more than 15 months after the close of one taxable year and more than 21 months after the close of the next taxable year, it could not exclude those patronage refunds from income for the taxable years then before the Court. We reasoned that exclusion from income by the cooperative depended upon prompt notification to its patrons because "the pattern of taxation adopted by Congress in section 101(12)(B) of the 1939 Code and section 522(b)(2) of the 1954 Code, with respect to the taxation of the refundable earnings of exempt cooperative associations indicates a congressional intent to tax to the individual patron his share of a patronage refund deducted by the cooperative." 33 T.C. at 270. In this we were supported by the 1951 Revenue Act Finance Committee Report, supra, which stated, at p. 21, "As a result of this action, [the amendment adopted by the 1951 Revenue Act] all earnings or net margins of *345 cooperatives will be taxable either to the cooperative, its patrons or its stockholders * * *" (with exceptions not here material). As indicated above, three circuits had already taken an apparently contrary view in suits by patrons. The Courts of Appeals concluded that Congress had not legislated in accordance with our understanding of the committee report. On December 3, 1959, 16 days after this Court's decision in Farmers Cooperative, the Commissioner caused to be published in the Federal Register the above-noted amendment to conform his regulations to the Court of Appeals' decisions. On February 1, 1960, the Treasury Department's representative testified at the Ways and Means Committee hearings on taxation of cooperatives that: Corrective legislation is clearly needed because under existing law it is possible for a cooperative to exclude from its taxable income certain noncash patronage dividends paid to its members which, at the same time, are not taxable to the members who receive them. [Hearings on Tax Treatment of Cooperatives. H. Rept. Ways and Means Committee. 86th Cong., 2nd Sess., February 1-5, 1960, p. 5.] The following year, our decision in Farmers Cooperative was reversed., *346 288 F. 2d 315, 325-326 (C.A. 8, 1961). The Court of Appeals noted that although Congress placed specific restrictions upon exempt cooperatives with regard to when the patronage refund must have been allocated, "No like provision is made for nonexempt corporations." No cases were found imposing such requirements upon nonexempt cooperatives and the Commissioner had issued no regulations or rulings in effect during those years (1953 and 1954) imposing such requirements. The Court of Appeals concluded that "The taxpayer here has apparently met the traditional standards applied to this situation" (288 F. 2d at 326) and held the patronage refunds excludible from the taxpayer's income. The position the Commissioner took in Rev. Rul. 56-225 and which he takes in this proceeding is different from that which he took in Farmers Cooperative on this point. It also differs from Rev. Rul. 59-322, 1959-2 C.B. 154, which asserts that the allocation must be made by the due date of the return (2 1/2 months after the end of the taxable year). The latter revenue ruling then notes the confusion engendered by the Code provisions regarding exempt farmers' cooperatives and states that, as to taxable years *347 ending prior to January 1, 1960, any allocation made within 8 1/2 months after the end of the taxable year to which it related would be treated as having been made during the taxable year to which it related. Petitioner notified its members of their allocations for petitioner's 1956 taxable year within five months after the end of that year. This allocation meets the test which respondent indicated in Rev. Rul. 59-322 would be applicable to that year. The allocation for petitioner's 1955 taxable year was made within 12 months after the end of that year. Respondent makes no effort to explain the reason for his position in Rev. Rul. 56-225, [21] *348 nor the apparent inconsistency between that position and the one he takes in Rev. Rul. 59-322. [22] Respondent does not appear to have issued any further rulings or any regulations on this point since the period described in Farmers Cooperative, which overlaps to some extent the period before us on this issue. Respondent does not rely upon or even cite our decision in Farmers Cooperative, which was promulgated almost nine months before respondent's reply brief herein was filed. Respondent has recognized that "patronage * * * refunds due patrons of a cooperative organization are not profits of the cooperative organization notwithstanding the amount due such patrons cannot be determined until after the closing of the books of the cooperative organization for a particular taxable period." G.C.M. 17895, 1937-1 C.B. 56. In I.T. 1566, II-1 C.B. 85 (1923) a deduction was allowed for year one for rebates paid in year two on account of purchases made in year one. "Taxable years" are referred to. There is no suggestion that the rebate must be made by the due date of the return. Under these circumstances we are persuaded that the allocations herein, each made within the taxable year immediately following the one to which it related, were timely for the years before us. [23] We do not find it necessary, on the state of this record, *349 to determine whether we will follow the Court of Appeals' decision in Farmers Cooperative that allocations made more than one full year after the taxable years to which they relate may nevertheless be deducted in the taxable years to which they relate. [23] On its returns for its taxable years 1955 (nine months after October 1, 1954) and 1956, petitioner included depreciation in its schedules of "Operating and Other Expenses" and then reduced its deductions by equal amounts on its "Statement of Earnings" with notations to the effect that such depreciation was not used in calculating members' book credits, i.e., did not reduce the amount available for patronage refunds of operating surplus. The effect of these computations *350 was to avoid a double reduction of taxable income on account of a single amount. Since excludable patronage refunds in the case of a purchasing cooperative [24] are properly a return of collections which exceeded expenses, a book credit return of an item which also was properly treated as an expense would not be a true patronage refund. This consideration will be taken into account in a Rule 50 computation. See issue (2), supra. In each of the two years involved in this issue, there was a difference between the book credits allocated to members on account of excess revenues and additions to funded reserves on the one hand and the corresponding patronage refunds deducted on the returns on the other hand. The returns indicate that the excess revenue book credits deducted on the returns were derived by adding back to the actual excess revenues, the amounts of Federal and state income taxes and a "charge off of refrigerators and ranges sold or discarded," and then reducing such sums by the amounts of nonmember income *351 for the years involved. The returns do not explain the differences in the reserve accounts book credits. The amounts excludable as patronage refunds in the Rule 50 computation will not exceed the amounts actually allocated to petitioner's members nor will the excess revenue book credits include amounts in addition to net after-tax revenue from members. The book credits forfeited by a member who leaves before the end of petitioner's fiscal year and sells his membership to petitioner are allocated to the remaining members. These amounts have not arisen from the patronage of those to whose accounts they have been credited. Under the Pomeroy tests, supra, these reallocated amounts are not excludable from petitioner's income. With the modifications indicated herein, on this issue we hold for petitioner. Issue (5) - North Carolina Income Taxes Petitioner states that if we determine deficiencies for any of the years before us, petitioner will be required to pay additional North Carolina income taxes, plus interest thereon, for those years. Petitioner urges that, as an accrual basis taxpayer, it should be permitted to accrue and deduct such tax and interest items in the years to which they *352 relate. This contention was made and rejected in Globe Tool & Die Manufacturing Co., 32 T.C. 1139 (1959). We have not found and petitioner has not suggested any reason for re-examining the issue or for deeming Globe Tool inapplicable here. On this issue we hold for respondent. Issue (6) - Net Operating Loss 1947-1948 Petitioner maintains that it sustained a net operating loss for the period April 1, 1947 - March 31, 1948, [25] *353 that its status regarding Federal income tax exemption was the same during that period as it was thereafter. If petitioner was not exempt thereafter, petitioner argues it could not have been exempt during the period and it was entitled to carry forward this loss under the provisions of sections 23(s) and 122 of the 1939 Code. Petitioner's view is that during the period April 1, 1947 - March 31, 1948, it was a vendee in possession, operating the housing project for its own profit. Respondent contends that petitioner was not a taxable entity during the period relevant to this issue because it was then an agency of the United States Government. We agree with petitioner. The purchase and sales contract entered into between petitioner and PHA provided for disposition of any excess of project revenue over PHA approved expenditures: (1) to be kept by PHA as rental if the contract terminated prior to delivery by PHA of conveyance documents to petitioner and (2) otherwise to be applied to payment of petitioner's interest and purchase price obligations under the contract. We find no provision for the possibility that petitioner might spend more than it received from operation of the project. From this we gather the intention of the parties to that contract to have been that profits and losses would inure to and be borne by petitioner, at least if petitioner survived this testing period. In this regard, petitioner acted for its own and its members' profit to the same relevant extent before as well as after the property was deeded to it. Even if petitioner's role in the housing programs of the United States *354 Government might cause petitioner to be deemed a Government agency for other purposes, [26] it does not appear that at any time during the period before us the role was such as to make it exempt from Federal income taxation on this ground. In this understanding we are reinforced by the Court of Appeals' analysis of the effect of PHA regulation of petitioner upon petitioner's arguments for tax exemption as a social welfare organization., 305 F. 2d at 819. We conclude, on the basis of the law applicable to this case, that petitioner was not exempt from taxation during the period April 1, 1947 - March 31, 1948. Since we have found that petitioner did sustain a net operating loss during that period as claimed, we hold for petitioner on this issue. Decisions will be entered under Rule 50. Footnotes
1. Application of the statute of limitations to petitioner's taxable year 1951 was raised by the pleadings, but was withdrawn by petitioner's counsel at trial.↩
2. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income-taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.↩
3. SEC. 302. EXEMPTION OF CERTAIN ORGANIZATIONS FOR PAST YEARS. * * *
(b) Period of Limitations. - In the case of an organization which would otherwise be exempt under section 101 of the Internal Revenue Code were it not carrying on a trade or business for profit, the filing of the information return required by section 54(f) of the Internal Revenue Code (relating to returns by tax-exempt organizations) for any taxable year beginning prior to January 1, 1951, shall be deemed to be the filing of a return for the purposes of section 275 of the Internal Revenue Code↩ (relating to period of limitation upon assessment and collection). * * *
18. H.R. Rep. No. 871, 78th Cong., 1st Sess. 24-25; S. Rep. No. 627, 78th Cong., 1st Sess. 21.↩
4. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * *
(g) Certain Income Tax Returns of Corporations. - * * *
(2) Exempt organizations. - If a taxpayer determines in good faith that it is an exempt organization and files a return as such under section 6033, and if such taxpayer is thereafter held to be a taxable organization for the taxable year for which the return is filed, such return shall be deemed the return of the organization for purposes of this section. Section 6501(g)(2) I.R.C. 1954 does not apply to years prior to 1954 ( section 7851(a)(6) I.R.C. 1954↩) and there was no comparable provision in the 1939 Code. S. Rept. 1622, 83d Cong., 2d Sess., June 18, 1954, pp. 144, 145, 585.
5. See John Danz, 18 T.C. 454, 465 (1952), affd., 231 F. 2d 673 (C.A. 9, 1955); F. E. McGillick Co., 30 T.C. 1130, 1150 (1958), affd. on this point, 278 F. 2d 643↩ (C.A. 3, 1960). 6. E.g. section 302(b), Revenue Act of 1950; section 6501(g)(2) I.R.C. 1954↩.
7. * * * Lake Forest, Inc. is not a movement of the citizenry or of the community. Rather, At most it is a venture - unquestionably praise-worthy - for securing its members living quarters. * * * II. Nor is "social welfare" the beneficence sponsored by Lake Forest, Inc. * * * It does not propose to offer a service or program for the direct betterment or improvement of the community as a whole. * * * Lake Forest does, of course, furnish housing to a certain group of citizens but it does not do so on a community basis. It is a public-spirited but privately-devoted endeavor. Its work in part incidentally redounds to society but this is not the "social welfare" of the tax statute.
8. SEC. 23. [I.R.C. 1939] DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(1) Depreciation. - A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income. This provision was re-enacted as section 167(a), I.R.C. 1954↩.
9. Respondent cites Maryland, District of Columbia, and New York cases to that effect. Compare I American Law of Property, (1952) sec. 3.10, pp. 200-202, and cases there cited.↩
10. Explained in Borland v. Commissioner, 123 F. 2d 358, 362 (C.A. 7, 1941), reversing, 43 B.T.A. 332 (1941), as follows: There was involved a co-operative apartment venture, in corporate form. The court held that the apartment owner could not deduct the tax imposed on his interest in the property. This conclusion was necessitated by reason of the fact that the corporation was listed on the assessment books as the owner, and the corporation paid the tax, and deducted it in making its corporate income tax return. The court pointed out those facts stating that the taxes were paid by the corporation and not by the "complainants," and that the corporation had already received the benefit of the deductions for the taxes paid.
11. While we recognize the limited usefulness of congressional actions as aids to interpretation of earlier-enacted statutes (see Estate of John G. Stoll [Dec. 25,493], 38 T.C. 223, 246-247 (1962), on appeal, C.A. 6, December 21, 1962, and cases there cited), we nevertheless will give weight to those later actions which evidence a consistent continuing view of the earlier law.
12. Cf. reference to condominiums in Senate discussion of section 28 of the 1962 Revenue Act, supra.↩
13. SEC. 118. CONTRIBUTIONS TO THE CAPITAL OF A CORPORATION. (a) General Rule. - In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer. (b) Cross Reference. - For basis of property acquired by a corporation through a contribution to its capital, see section 362↩. 14. Sec. 29.22(a)-16. Contributions to Corporation by Shareholders. - If a corporation requires additional funds for conducting its business and obtains such needed money through voluntary pro rata payments by its shareholders, the amounts so received being credited to its surplus account or to a special capital account, such amounts will not be considered income, although there is no increase in the outstanding chares of stock of the corporation. The payments under such circumstances are in the nature of voluntary assessments upon, and represent an additional price paid for, the shares of stock held by the individual shareholders, and will be treated as an addition to and as a part of the operating capital of the company. (See sections 29.22(a)-13 and 29.24-2.)
15. See sections 362(a)(2) I.R.C. 1954 and 113(a)(8)(B)I.R.C. 1939, which provide that property contributed to capital takes the same basis in the hands of the donee corporation as it had in the hands of the donor, adjusted to the extent of the donor's gain or loss. Cf. section 362(c)(2) I.R.C. 1954↩ dealing with money contributions to capital after January 22, 1954, by nonstockholders. Here the contributions were by members, treated for our purposes as stockholders, acting as such.
16. SEC. 522. TAX ON FARMERS' COOPERATIVES. * * *
(b) Computation of Taxable Income. - * * *
(2) Patronage dividends, etc. - Patronage dividends, refunds, and rebates to patrons with respect to their patronage in the same or preceding years (whether paid in cash, merchandise, capital stock, revolving fund certificates, retain certificate, certificates of indebtedness, letters of advice, or in some other manner that discloses to each patron the dollar amount of such dividend, refund, or rebate) shall be taken into account in computing taxable income in the same manner as in the case of a cooperative organization not exempt under section 521. Such dividends, refunds, and rebates made after the close of the taxable year and on or before the 15th day of the 9th month following the close of such year shall be considered as made on the last day of such taxable year to the extent the dividends, refunds, or rebates, are attributable to patronage occurring before the close of such year. This provision re-enacts, without substantive change, part of section 101(12)(B) I.R.C. 1939, added by section 314(a) of the Revenue Act of 1951. H. Rept. I.R.C. 1954, supra, p. A172; S. Rept. I.R.C. 1954, supra, p. 314↩. 17. Cf. section 17(a) of the Revenue Act of 1962.↩
18. This is changed by sections 1382(b) and 1385(a) I.R.C. 1954↩, added by section 17(a) of the Revenue Act of 1962. Section 17(c)(3) of that Act makes its provisions inapplicable to the years before us. 19. The Commissioner places great weight on the argument that by 26 U.S.C. § 101(12)(B) an exempt cooperative is permitted to deduct from gross income patronage dividends such as are here involved and that there was testimony before committees of Congress to the effect that these would be returned for taxation by the recipients. The answer is that Congress while granting the right to the deduction by the cooperative left the matter of taxing the dividends to the recipients to be dealt with by existing law, making no change whatever with regard thereto, with the result that cash basis taxpayers will report as income patronage dividends such as are here involved in the year when payment thereof is received and accrual basis taxpayers will report them as income for the year in which the right to receive payment becomes reasonably definite and certain.
20. Section 314 of your committee's bill continues the exemption provided by section 101(12) of the code but removes from its application earnings which are placed in reserves or surplus and not allocated or credited to the accounts of patrons. In addition to being taxfree with respect to patronage dividends paid or allocated to patrons, as is generally also true in the case of other cooperatives, the cooperatives coming under section 101(12)↩ are also to remain exempt with respect to amounts paid as dividends on capital stock, and with respect to amounts allocated to patrons where the income involved was not derived from patronage, as for example in the case of interest or rental income, and income derived from business done with the Federal Government. Moreover, they will not be taxed in any way with respect to reserves set aside for any necessary purpose, or reserves required by State law, if such reserves are allocated to patrons. [Italics supplied.]
21. Petitioner suggests that the result in that ruling is explainable by the absence of any reference therein to a pre-existing obligation to make patronage refunds - such obligation being one of the prerequisites to exclusion under Pomeroy. 22. Rev. Rul. 59-322↩ is based on T.I.R. 175, September 16, 1959, issued before the trial in this case and almost a year before respondent's reply brief herein was filed.
23. The comments in H. Rept. 1447, 87th Cong., 2d Sess., March 16, 1962, p. 80, and S. Rept. 1543. 87th Cong., 2d Sess., August 16, 1962, p. 113, that under present law allocations must be made by the due date of the return are not nor do they purport to be based on lines of case law or consistent administrative action by the Commissioner. We do not consider these statements as to prior law to be of significant value in reaching our decision here. Cf. footnote 11, supra.↩
24. A housing cooperative more closely resembles a cooperative purchasing of facilities and services than a cooperative selling of products or services generated by its members.↩
25. Although this period is prior to the start of the earliest taxable year before us, we may nevertheless consider such facts with relation to petitioner's taxable status and income for this period as may be necessary correctly to determine petitioner's taxes for the taxable years before us. Sections 272(g) of the 1939 Code and 6214(b) of the 1954 Code.
26. Cf. Dorsey v. Stuyvesant Town Corp., 299 N. Y. 512, 87 N.E. 2d 541 (1949); Johnson v. Levitt & Sons, 131 F. Supp. 114 (E.D. Pa., 1955); Ming v. Horgan, 3 Race Rel. L. Rep. 693, 1958). These cases are discussed in 28 Geo. Washington L.R. 758, 764-767 (1960)↩.