LAKE PETERSBURG ASSOCIATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lake Petersburg Asso. v. Commissioner
Docket No. 1559-72.
United States Tax Court
T.C. Memo 1974-55; 1974 Tax Ct. Memo LEXIS 266; 33 T.C.M. (CCH) 259; T.C.M. (RIA) 74055; March 5, 1974, Filed. *266 Petitioner, organized pursuant to the "General Not For Profit Corporation Act" of Illinois, constructed a man-made lake with funds received by it from its members. Upon paying a membership fee, each member became entitled to lease lots near the lake, for which each member was required to pay a lot assessment plus an annual lot rental fee. Held: Petitioner is not exempt from taxation pursuant to section 501. Held, further: The lot assessments paid to petitioner are contributions to capital and not includable in petitioner's gross income. Held, further: The membership fees and annual lot rentals are includable in petitioner's gross income. Seven-Up Co., 14 T.C. 965 (1950), distinguished. Held, further: Certain land improvements constructed by the petitioner are depreciable over a useful life of thirty years. Held, further: Petitioner is subject to the addition to tax imposed by section 6651(a). Lawrence M. Dubin and Stephen B. Bell, for the petitioner. Rex A.Guest, for the respondent. Laurence M. Dubin and Stephen B. Bell, for the Petitioner.Rex A. Guest, for the Respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: The respondent determined the following *267 deficiencies in, and additions to, the income tax of petitioner: Taxable Year Ended
Asserted
[1] Section 6651(a) January 31
Deficiency
Addition to Tax 1962
$202,596.57
$ 50,649.14
1963
66,385.05
16,596.26
1964
39,833.91
9,958.48
1965
53,735.96
13,433.99
1966
19,962.60
4,990.65
1967
3,359.27
839.81
Some issues having been settled, the remaining issues are: (1) Whether petitioner is exempt from taxation pursuant to section 501; (2) Whether certain lot assessments paid to petitioner are not includable in petitioner's gross income because they are either contributions to capital or amounts received in an agency or trustee capacity; (3) Whether certain membership fees and annual lot rentals paid to petitioner are amounts received in an agency or trustee capacity and thus not includable in petitioner's gross income; (4) Whether certain land improvements constructed by petitioner are depreciable and, if so, what is the useful life of those improvements; and (5) Whether petitioner is subject to the addition to tax imposed by section 6651(a). FINDINGS OF FACT Some of the facts *268 have been stipulated and are found accordingly. Lake Petersburg Association (hereinafter referred to as petitioner) was organized on June 21, 1960, under the "General Not For Profit Corporation Act" of Illinois. Its principal office at the time of filing the petition was located at Petersburg, Illinois. Petitioner is the owner of a lake of approximately 200 acres (Lake Petersburg) and approximately 700 acres of land surrounding the lake, all located approximately one-half mile south of the City of Petersburg, Illinois. Petitioner's Articles of Incorporation state that it was formed for the following purpose: The development of the social and civic life among the members of the Association by the ownership, construction, operation, maintenance and control of a lake and adjacent recreational facilities including swimming pools and other swimming facilities, club houses, boating and fishing facilities, golf courses, and picnic areas, together with all other improvements, additions and equipment, either necessary or convenient, for the use, recreation, convenience, enjoyment and benefit of the Association members and their guests, and to maintain the same through the Association's *269 earnings, and through gifts and contributions from the members thereof. The lake project was proposed by a group of five Petersburg businessmen in an attempt to stimulate the business and social life of Petersburg, which was not experiencing the population growth that the State of Illinois as a whole was experiencing. Sometime prior to 1959, these men first presented their idea to the Petersburg Chamber of Commerce, which directed them to act as a committee (hereinafter referred to as the "Lake Committee") to investigate the feasibility of the lake project. During 1959 and 1960, the Lake Committee acquired eight options on the approximately 900 acres of land upon which the lake was to be constructed. Each option was acquired at a cost of approximately $50. The price per acre payable for the land under the options ranged from approximately $150 to $450 an acre. The projected land acquisition cost under the options was approximately $205,000. The individual committeemen contributed about $250 each to finance the cost of the options. Other monies were contributed by the City of Petersburg, the Petersburg Chamber of Commerce and two local banks. On advice of counsel, the Lake Committee *270 of the Chamber of Commerce incorporated petitioner in June 1960. All of the assets of the Lake Committee, including the land purchase options, were turned over to petitioner, and thereafter, petitioner carried on the activities of the Lake Committee as its successor. The members of the Lake Committee were petitioner's incorporators and became its director members. Petitioner was incorporated as a not for profit corporation because it was the intent of petitioner's incorporators to construct the lake project without profit to any person connected with the Chamber of Commerce or petitioner. The City of Petersburg furnished its City Council Chamber for petitioner's use until June 1963, when petitioner constructed an office of its own. A firm of consulting engineers prepared for petitioner an estimate showing that the construction cost of the dam, lake bed, roads and related facilities would be approximately $1,130,000. This estimate did not include the cost of the land. The firm also prepared a plat showing 897 lots around the proposed lake. On the basis of the engineer's report and expected cost savings, petitioner determined that it would require a budget of $1,200,000 for the *271 acquisition of the land and the construction of the dam, lake bed, roads and other improvements. A committee appointed by the Chamber of Commerce and composed of members of the Chamber of Commerce assessed a pro rata share of the cost against each of the lots platted by the engineers, with the exception of approximately 45 lots as to which petitioner was unsure of its ability to obtain clear title. The assessments were established in a manner which would generate an amount sufficient to fund petitioner's estimated costs, with no profit. The lot assessments ranged from a low of $635 to a high of $7,620 and averaged about $1,400. Only eight lot assessments exceeded $3,000. The total of the original assessments was about $1,193,000. Persons interested in obtaining a long-term lease on a particular lot or lots completed a form "APPLICATION FOR REGULAR MEMBERSHIP IN LAKE PETERSBURG ASSOCIATION AND LOT SELECTION," designated the lot or lots desired, paid a membership (initiation) fee of $25, paid a down payment on the lot assessment and agreed to pay the balance of the assessment if accepted as a member. Petitioner made representations to applicants for regular membership that the *272 amounts paid in respect of the assessments of the lots would be placed into a pool or fund to be used for purchase of the land and the construction of various improvements thereon. The Board of Directors divided the lots which had been platted around the lakefront into three zones as follows: (a) The "residential zone" consisted of 274 lots on which the regular members could build only permanent year-round residences in compliance with petitioner's building code; (b) The "unrestricted zone" consisted of 569 lots on which the regular members could build seasonal residences as well as year-round residences in compliance with petitioner's building code; (c) The "commercial zone" consisted of 10 lots on which regular members could build commercial structures in compliance with petitioner's building code. The commercial zone has been utilized only for the construction of an American Legion Post building. During 1965, 1966 or 1967, five or six lots in the commercial zone were changed by petitioner from commercial to residential zoning. Petitioner began accepting subscriptions for regular membership in March 1961. Director members had first choice and were allowed to designate two residential *273 lots and one cottage lot for their own use. Director members paid their lot assessments, membership fees and annual rentals on the same terms as regular members. The lots selected by the director members were assessed in the same manner as those selected by other regular members. During a one-week period, only Menard County residents were eligible to apply for regular membership in petitioner. Thereafter, regular membership applications were taken from the public generally. For a short initial period, petitioner agreed with applicants to request payment of the balance of each assessment only after petitioner had received applications for lots having total assessments in a sufficient dollar amount to indicate the financial feasibility of the project. Prior to July 11, 1961, petitioner decided that the volume of applications indicated financial feasibility and called for the balances due on the outstanding assessments. The down payments were segregated from other funds of petitioner in separate bank accounts. No professional brokers, salesmen or real estate agents were employed by petitioner in connection with taking applications for membership or the leasing of lots at any time. *274 For a short period of time, petitioner paid its regular members (other than director members) $25 for referring new regular members to petitioner. Petitioner paid no commissions or fees to any person in connection with the leasing of lots other than the $25 referral fee. During the period from March 1961 to the date of trial approximately 550 lots had been leased by petitioner to its members. Over 235 lots which were platted on the map are not available for lease. These lots were removed from availability by the Board of Directors in approximately 1967. In addition to the 235 lots removed from availability, there are 45 lots in the so-called LaBarre property, which had been removed from availability beofre March 1961, due to title problems. Later, the title to this property was cleared. Approximately six or eight useable lots are available within the LaBarre property. Sixty to seventy lots remain available for leasing. These lots are generally much less desirable than the lots which already have been placed under lease. After petitioner decided that the project was financially feasible, the Board of Directors contracted for the excavation of the dam and construction of the *275 lake and roads and exercised the land purchase options. The land was acquired during the period beginning in the summer of 1961 and continuing into 1962. Construction of the dam and lake bed began in the summer of 1961 and was completed in 1963. Petitioner was able to construct the dam, lake bed and roads for less than the engineer's estimate, by reason of various cost savings. Through special arrangements with the County Road Department, petitioner was able to build the roads for $125,558.14, rather than $158,825 as estimated by the engineer. Constructing the dam and lake bed cost $372,065.96 rather than $568,000 as estimated by the engineer. Petitioner was able to avoid the expense of installing a water system, thereby saving almost $254,000, the estimated cost of a water system. Petitioner decided to let the lake bed fill naturally rather than install a pumping station for $69,300, thereby effecting a savings equal to the full amount of the projected cost. The foregoing cost savings enabled petitioner to complete the project (except for future planned improvements) even though a number of lots were not suitable for use and were ultimately removed from availability. This benefited *276 the petitioner's members since approximately 235 of the 897 lots originally platted were removed from availability for occupancy, thereby reducing the threat of sewage pollution to the lake. Petitioner's books of account consisted of books of original entry (journals) and a general ledger. The journals were kept in the ordinary course of petitioner's activities and accurately reflect its receipts and disbursements. The revenues received by petitioner from its members in respect of assessments on the lakefront lots were characterized on petitioner's balance sheets as capital items and were not recorded or taken into account as income items. Petitioner considered the lot assessments available only for capital improvements. Petitioner's other revenues, including the rents under the leases and the membership fees, were treated as income items on petitioner's profit and loss statements. A summary of petitioner's revenues and expenditures for each of the taxable years in question, indicating the revenues received from members and the revenues received from nonmembers is set forth as follows: TAXABLE YEARS ENDING JAN. 31
1962
1963
1964
1965
REVENUE FROM MEMBERS :
Assessments
$412,039.34
$129,198.95
$ 91,273.12
$114,458.55
Lot Rentals
--
--
4,875.00
11,542.50
Membership Fees
5,450.00
1,300.00
1,375.00
1,475.00
Inspection Fees
--
--
408.00
614.00
Mowing Fees
--
--
--
--
Boat Fees
--
--
68.00
348.00
TOTAL FROM MEMBERS
$417,489.34
$130,498.95
$ 97,999.12
$128,438.05
REVENUE FROM NON-MEMBERS
481.67
9,176.81
11,418.15
7,897.50
TOTAL REVENUES
$417,971.01
$139,675.76
$109,417.27
$136,335.55
$ 85,370.50
EXPENDITURES :
Capital
262,091.81
287,325.15
118,563.47
86,177.17
Noncapital
3,892.17
15,506.82
15,911.38
17,155.70
TOTAL EXPENDITURES
$265,983.98
$302,831.97
$134,474.85
$103,332.87
TAXABLE YEARS ENDING JAN.
31
1966
1967
Totals
1962-1967 REVENUE FROM MEMBERS :
Assessments
$ 62,223.06
$ 40,936.28
$850,129.30
Lot Rentals
13,335.00
14,160.00
43,912.50
Membership Fees
950.00
875.00
11,425.00
Inspection Fees
627.00
572.00
2,221.00
Mowing Fees
--
415.00
415.00
Boat Fees
568.00
836.00
1,820.00
TOTAL FROM MEMBERS
$ 77,703.06
$ 57,794.28
$909,922.80
REVENUE FROM NON-MEMBERS
7,667.44
5,247.35
41,888.92
TOTAL REVENUES
$417,971.01
$ 63,041.63
$951,811.72
EXPENDITURES :
Capital
38,584.67
16,893.54
809,635.81
Noncapital
15,991.46
21,383.37
89,840.90
TOTAL EXPENDITURES
$ 54,576.13
$ 38,276.91
$899,476.71
*277 A balance sheet of petitioner as of January 31, 1967, is set forth as follows: ASSETS Cash
$ 19,439.46
Certificates of Deposit
33,000.00
Land Acquisition Cost
212,027.22
Land Improvements
589,574.27
Other Capital Expenditures
8,034.32
$862,075.27
LIABILITIES AND RETAINED EARNINGS
Assessments
$850,129.30
Unallocated Deposits
2,500.00
Retained Earnings
9,445.97
$862,075.27
The original director members were elected by the incorporators of petitioner. Vacancies among the director members are filled by vote of the director members. The director members elect the Board of Directors. The director members and the Board of Directors share the management responsibilities of petitioner. All members share the common assets of petitioner, including the lake, roads and open areas. Use of the common assets of petitioner is limited to its members and their guests. Petitioner has never paid any dividends or other compensation to any of its director members or regular members other than: salary paid to John Terhune, a director member, for services as custodian; referral fees of $25 paid for a short period of time to regular members for bringing in new members; and a fee of $15 per meeting attended paid to members *278 of the Board of Directors beginning in 1972. No part of the net earnings of petitioner inures to the benefit of any of its director members, regular members or other private individuals. Article II, Section 3 of petitioner's by-laws provides: Voting Rights. Each Director Member shall be entitled to one vote on each matter submitted to a vote of Director Members and each Regular Member shall be entitled to one vote on each matter submitted to a vote of the Regular Members. Regular members would be entitled to a vote on a plan of liquidation pursuant to the Illinois Not For Profit Corporation Act. Petitioner leased lots to its members rather than selling them to its members or other persons so that petitioner could maintain control of the development of the lots. A uniform printed lease was used by petitioner at all times material to this case. The lease used by petitioner provides for a ninety-nine year term with an option in favor of the lessee to renew for an additional ninety-nine year term. The lessee is responsible for the payment of real estate taxes assessed on the leased property; the real estate tax bills are sent to the lessee. The lessee may mortgage his interest *279 in the lease to finance construction of improvements. The improvements constructed on the leased premises by the lessee belong to the lessee. Leases may be transferred by the lessee after obtaining the written consent of petitioner subject to a right of first refusal of adjacent lessees. There has been a substantial number of transfers of leases. The transferee of a lease must first be a regular member of petitioner. If a proposed transferee is not already a regular member, he must become a regular member of petitioner by applying for membership and paying a membership fee. Transferees of leases do not pay an additional assessment as to the leased lot, the assessment being a one time fee. Petitioner terminates the membership of transferors of leases who are not lessees of other lots at Lake Petersburg. he form lease executed by petitioner and each of its members provides for a rental of $30 per year for each lot leased. This rental was set by petitioner in order to offset its operating expenses. Petitioner bills each of its members for this rent annually. In the early years of petitioner's existence, petitioner billed less than the $30 a year because it estimated its operating *280 expenses to be less for those years. Petitioner mails annual reports to each of its members, reporting on its activities for the previous year. In its annual reports, petitioner accounts to its members for the funds received and expended by it and sets budgets for the coming years on the basis of anticipated receipts from members and other sources. The lake is seriously threatened by pollution from sewage. To alleviate the threat of pollution of the lake by sewage, petitioner would like to construct at its cost a sewage system. The estimated cost of the system is a minimum of $350,000. Petitioner plans to improve the roads surrounding the lake at an estimated cost exceeding $25,000. On advice of counsel and because of the pendency of the present law suit regarding petitioner's tax liability, petitioner has not expended any money on any additional capital improvements. Petitioner leases approximately 85 acres of its land to Menard Golf Association for use as a golf course. The lease term is sixty years and the rent payable under the lease is five percent of gross fees and membership dues. The rent has averaged about $2,000 a year. The golf association is not related to petitioner *281 except as its tenant. Approximately 140 acres of petitioner's land in three separate tracts are leased as farmland. This land is rented by petitioner as farmland in order to protect Lake Petersburg against siltation. Petitioner requires the installation of extensive grass waterways which slow run-off water so that it loses its sediment prior to entry into the lake. The farm income was used as an incidental part of the development expense. The development of Lake Petersburg has attracted to the Petersburg area, as members of petitioner, 101 families as new permanent residents, 32 families as seasonal residents and 115 families as occasional users of Lake Petersburg. The town of Petersburg is the closest retail shopping center to Lake Petersburg. There are presently no vacancies in commercial property in Petersburg, which represents a reversal of the trend of prior years. The development of Lake Petersburg stimulated the economy and social life of the City of Petersburg. Petitioner was advised by counsel early in its existence that it was exempt from Federal income tax and therefore it need not file income tax returns. Petitioner relied on the advice of counsel by not filing *282 income tax returns when they were due. Petitioner filed an application on August 23, 1963, for an exemption from taxation under section 501(c) (7). On October 2, 1964, the respondent ruled that petitioner did not qualify for exemption under section 501(c) (7). In response to a protest of this ruling the respondent on February 28, 1966, affirmed its previous letter ruling. Petitioner did not file a return as an organization exempt from Federal income tax for any of its taxable years ended January 31, 1962 to January 31, 1967, inclusive; neither did petitioner file a Federal income tax return, or a return as an organization exempt from Federal income tax, for any taxable year or period ending prior to February 1, 1961. Petitioner did not apply for an extension of time within which to file its returns for any of the years in issue. Petitioner filed corporation income tax returns for the taxable years ending January 31, 1962 through January 31, 1967 on November 24, 1967 after respondent's agent commenced an investigation of petitioner's tax liabilities. The returns filed by petitioner reported the assessments as gross receipts or gross sales and, in determining gross profit, reduced *283 that amount by an amount representing cost of goods sold. For the taxable years ending January 31, 1962 through January 31, 1966, the amount reported as gross profit was zero. For the taxable year ending January 31, 1967, the amount reported as gross profit was $36,815.16. Petitioner included the membership fees and annual rentals in its gross income on its returns as filed. Petitioner did not claim depreciation on the dam, lake bed and roads on its returns as filed. OPINION I. Exemption from Tax The first issue for decision is whether petitioner is exempt from taxation pursuant to section 501. Petitioner contends that it qualifies for exemption as an organization described in sections 501(c) (4), 501(c) (6), 501(c) (7), or 501(c) (12). Section 501(c) (4) provides an exemption from taxation for civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare. (4)-1 (4)-1 (4)-1 Section 1.501(c) (4)-1(a) of the Income Tax Regulations states that an organization is operated exclusively for the promotion of social welfare if it is primarily engaged in promoting in some way the common good and general welfare of the people of *284 the community. To qualify for exemption, the organization must provide benefits for the community as a whole. People's Educational Camp Society, Inc., 39 T.C. 756 (1963), affd. 331 F.2d 923 (C.A. 2, 1964). Petitioner argues that it qualifies for exemption under this section because it was created to stimulate the economy of Petersburg and to make Petersburg a better place to live. Respondent contends that petitioner was operated primarily for the benefit and use of its members and that its activities were not directed toward the social welfare of the entire community. The evidence does not establish that Lake Petersburg resulted from the civic motivation of the Petersburg Chamber of Commerce. In this regard the record establishes that a limited group of individuals, namely five businessmen who happened to be members of the Chamber of Commerce, were instrumental in the formation of petitioner and in the conduct of its affairs thereafter. There is no evidence whatsoever that the Chamber of Commerce acted as an independent organization in any matters concerning petitioner. We find that Lake Petersburg directly benefited only those people who were members and who therefore could *285 enjoy the facilities and environment that the lake provided. Although the initial idea behind Lake Petersburg was to stimulate the economy of the City of Petersburg, we believe that the economic benefits to the citizenry of Petersburg were indirect and remote. Accordingly, we conclude that Lake Petersburg was operated primarily for the benefit of its members rather than for the benefit of the entire community. Petitioner believes that the facts in the present case are analogous to those in Garden Homes Co. v. Commissioner, 64 F.2d 593 (C.A. 7, 1933). In that case a housing corporation was organized after a commission appointed by the mayor of Milwaukee concluded that a housing shortage existed and recommended that legislation be enacted to stimulate the erection of homes for wage earners. As a result of the committee's investigation, special legislation was enacted authorizing housing corporations to erect and lease dwellings and placing certain restrictions on their operations. Garden Homes was organized under this legislation. It constructed 105 homes, leased them and eventually sold some of them to the former tenants. The court found that the housing corporation was operated *286 exclusively for social welfare because the opportunity of obtaining low cost housing was extended to all working men who might desire it and who could comply with the terms required. We believe that the present factual situation is distinguishable from that in Garden Homes Co., supra, in which the housing project was conceived, initiated, controlled and largely financed by the city and county governments of Milwaukee. Although the idea behind Lake Petersburg first was presented at a meeting of the Petersburg Chamber of Commerce, the record does not establish that the City of Petersburg or the Chamber of Commerce actively supported and took part in the development of Lake Petersburg. To the contrary, Lake Petersburg was organized by certain individuals, who supervised and controlled its development. Section 501(c) (6) provides an exemption from taxation for business leagues or chambers of commerce not organized for profit and no part of the net earnings of which inures to the benefit of any private individual. Petitioner contends that it was sponsored by the Petersburg Chamber of Commerce and that it is in substance a mere extension of the Chamber of Commerce. We disagree with *287 petitioner. The record does not establish that petitioner was a Chamber of Commerce or an extension of a Chamber of Commerce. Although the idea to build Lake Petersburg was first presented at a meeting of the Petersburg Chamber of Commerce and a committee was organized to investigate this idea, the organization of Lake Petersburg Association was carried out by a group of individuals. The Articles of Incorporation of the petitioner do not suggest that any relationship existed between the petitioner and the Chamber of Commerce. Section 501(c) (7) provides an exemption from taxation for clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder. There must be at least some sort of commingling of members to constitute a social club exempt under this section. Chattanooga Auto. Club v. Commissioner, 182 F.2d 551 (C.A. 6, 1950), affirming 12 T.C. 967 (1949). In Chattanooga Auto. Club, the Court of Appeals found that the requisite commingling did not exist when the clubs did not have club houses, but only offices for the transaction of business and there were *288 only annual meetings of members for the election of directors. In the present case, the degree of commingling was no more extensive than in the Chattanooga Auto. Club case and in our opinion was not sufficient to establish that petitioner was a social club. Petitioner was engaged primarily in the construction and maintenance of a lake, around which members leased lots for residences and recreation. Petitioner did not build a club house and did not provide to any substantial extent for the commingling of its members. The only evidence of commingling presented was a statement by an officer of petitioner that petitioner sponsored a ski club for young people who liked to water ski. The officer stated that petitioner gave the club some financial support and a lot of moral support. This activity alone does not establish the requisite commingling. Section 501(c) (12) provides an exemption from taxation for mutual ditch or irrigation companies or like organizations if eighty-five percent or more of the income consists of amounts collected from members for the sole purpose of meeting losses and expenses. Petitioner contends that it is an organization like a mutual ditch or irrigation *289 company and is therefore exempt. We reject petitioner's argument that a recreational lake association is so comparable to a mutual ditch or irrigation company that it should be classified as a "like organization." The purpose and operation of these two types of organizations are clearly different. Accordingly, we hold that petitioner is not exempt from taxation pursuant to sections 501(c) (4), 501(c) (6), 501(c) (7) or 501(c) (12). Having so held, we next must consider petitioner's alternative arguments regarding whether certain items are includable in petitioner's gross income. II. Lot Assessments The second issue for decision is whether petitioner must include in gross income the amounts received by it as assessments for lots leased to its members. Petitioner contends that these amounts are not includable in income because they are contributions to capital pursuant to section 118 [2] or, alternatively, are amounts received in an agency or trustee capacity. Petitioner views itself as a not for profit corporation that was created for the limited purpose of constructing and maintaining a lake for its members, who contributed lot assessments so that petitioner could purchase the necessary *290 land and construct the lake and related facilities. Respondent contends that the lot assessments constitute advance rentals includable in gross income in the year received. Respondent views the transactions as commercial in nature and similar to techniques employed in promoting sales of lots by a commercial developer in which the financing of the project is usually of no concern to the purchaser. Respondent argues that the assessments are not contributions to capital because they were paid in consideration for goods or services rendered. We conclude that the description provided by the petitioner more accurately describes the true nature and substance of the transactions in issue. The taxpayer as well as the Government is entitled to the benefit of the rule that the substance rather than the form of a transaction controls. Landa v. Commissioner, 206 F.2d 431, 432 *291 (C.A. D.C., 1953); Frank Ciaio, 47 T.C. 447 (1967). Although the petitioner leased lots to its members for a consideration and collected annual rentals, we do not agree with respondent's view that the transactions in issue were commercial in nature. We agree with the petitioner that the petitioner was owned by its members and was organized to provide certain benefits for its members. Petitioner argues that the present factual situation is similar to that considered in 874 Park Avenue Corporation, 23 B.T.A. 400 (1931), and in Cambridge Apartment Building Corporation, 44 B.T.A. 617 (1941). In 874 Park Avenue Corporation, the taxpayer was incorporated for the purpose of acquiring, maintaining and operating a cooperative apartment building. The taxpayer purchased an apartment building, financing the purchase with a mortgage and with cash contributed by the shareholders in exchange for stock. Eight of the twenty-four apartments in the building were leased by stockholders under ninety-nine year proprietary leases at a nominal rent of $1.00 per year. The shareholder-tenants were also required to pay "additional rent and assessments" to be used for operating expenses and amortization *292 of the mortgage to the extent these items were not paid out of income from non-shareholder rentals. The amounts assessed to pay the principal indebtedness secured by the mortgage were required by the leases to be recorded on the taxpayer's books as "paid-in surplus," but were in fact entered on the taxpayer's ledger under the heading "assessments" in the capital stock account. The Court held that the additional assessments used to amortize the mortgages were contributions to the capital of the taxpayer rather than income as asserted by the Commissioner. Considering the Commissioner's argument that the assessments were referred to as rent in the leases and should be so treated, the Court concluded that this contention was refuted by a consideration of the lease as a whole and the purposes of the individual incorporators of the taxpayer. Petitioner argues that the leasing of lots for ninety-nine years to association members in the instant case is analogous to the leasing of apartments for ninety-nine years to shareholder-tenants in 874 Park Avenue Corporation. Respondent contends that the instant case is distinguishable from 874 Park Avenue Corporation because the Lake Petersburg *293 members are not stockholders and also because the petitioner did not earmark the assessments to be used solely for the purpose of making capital improvements. Respondent argues that the stockholder-tenants in 874 Park Avenue Corporation acquired not only a leasehold interest in a specific apartment but also an equity interest in the cooperative, whereas the regular members in the present case acquired only a leasehold interest and none of the rights of a shareholder. In support of this contention, respondent states that the regular members did not acquire the right to receive shares of stock, to receive dividends, to vote for the board of directors, or to share in the assets upon dissolution. Although the rights of the regular members are not the equivalent of those of a shareholder in a corporation, we conclude that the regular members did possess more extensive rights than those of a lessee. Accordingly, we conclude that the regular members were in the nature of shareholders. Respondent correctly states that the regular members did not acquire the right to receive shares of stock or dividends. These limitations, however, applied equally to director members, since under Illinois *294 law a not for profit corporation is prohibited from distributing stock or dividends to any person. We do not believe that the receipt of stock is required in order to find that the members of such a not for profit corporation are in the nature of a shareholder. Even though such members do not hold shares of stock, they remain the only owners of the corporation. Nor do we believe that the right to receive dividends is essential to finding that the members were in the nature of shareholders. The prohibition against paying dividends denied the members the right to share in the assets of the petitioner on an annual basis, but did not affect their ultimate ownership in the petitioner's assets. In support of his argument that the regular members were merely lessees, respondent also points out that the regular members did not have the right to vote for the board of directors. We do not believe that this restriction precludes a finding that the regular members were in the nature of shareholders. An analogous situation in the field of private corporations is the limitation that legally may be placed on the rights of preferred shareholders to participate in the management of a corporation *295 and to vote at corporate meetings. 2 Fletcher on Private Corporations, sections 5300, 5301 (1971). Respondent further argues that the regular members did not have the right to share in the assets of petitioner upon dissolution and that they, therefore, did not have any proprietary interest in the petitioner. Although we agree that the absence of any proprietary interest would support respondent's argument that the regular members were merely lessees, we conclude that the petitioner's by-laws, read in conjunction with the Illinois General Not For Profit Corporation Statute, establish that the regular members did have the right to share in the assets of petitioner upon dissolution. Section three of petitioner's by-laws provides that the director members and the regular members are entitled to vote on each matter submitted to their respective voting class. This provision conforms to section 163a14 of the Illinois General Not For Profit Corporation Statute (hereinafter referred to as the Statute) which provides that the rights of the members, or any class or classes of members, to vote may be limited, enlarged or denied to the extent specified in the by-laws. With regard to dissolution, *296 section 163a43 of the Statute provides that a corporation all of whose members have voting rights may present the question of dissolution to a vote at a meeting of members having voting rights. Similarly, section 163a45 provides that a corporation all of whose members have voting rights must submit a plan of distribution to a vote at a meeting of members having voting rights. Thus, the process of dissolving a corporation under the Statute requires the participation of both the director member and regular member classes. We, therefore, reject respondent's argument that the regular members had no rights upon dissolution. Having determined that petitioner's members are its only owners and are in the nature of shareholders, we proceed to consider respondent's argument that the assessments were not contributions to capital because they were not earmarked to be used solely for capital expenditures. Petitioner's representatives informed applicants for membership in petitioner that the assessments would be accumulated to be used for the purchase of the land and the erection of various improvements on the land. The record establishes that as of the end of the last taxable year in issue, *297 petitioner had collected assessments totaling $850,129.30 whereas actual capital expenditures amounted to $809,635.81. At this time there were also additional lots for which assessments had not been collected. We believe petitioner adequately has explained why the excess sums had not been spent for capital items. The assessments originally had been determined on the basis of cost estimates that exceeded the actual cost of building the dam. Thus, the petitioner did not intentionally collect assessments in excess of its capital needs. In addition, as of the end of 1967, petitioner hoped to make additional capital expenditures for roads and a sewer system. The excess funds had been retained by petitioner, however, because its attorney advised that petitioner stop expending its funds until the tax problems regarding exempt status were solved. On the basis of these facts, we conclude that petitioner adequately earmarked the assessments to be used for capital purposes. Accordingly, we hold that the assessments were paid as contributions to capital by the members who were in the nature of shareholders. 874 Park Avenue Corporation, supra, and Cambridge Apartment Building Corporation, supra. *298 III. Membership Fees and Annual Lot Rentals The third issue for decision is whether the membership fees and annual lot rentals are includable in petitioner's gross income. Petitioner contends that these items were held by it as an agent or trustee and should, therefore, not be included in petitioner's income. Petitioner argues that these amounts were received and expended for the sole purpose of offsetting its day-to-day operating expenses. In support of this argument, petitioner cites Park Place, Inc., 57 T.C. 767 (1972) and Seven-Up Co., 14 T.C. 965 (1950). We believe the facts in the present case are distinguishable from those cases. In Park Place, Inc. we held that a cooperative housing corporation should exclude from income certain assessments that were collected in order to pay certain specified expenditures such as wages, swimming pool maintenance, fire and storm insurance, and repair and maintenance expenses. In Seven-Up Co. we held that a corporation should exclude from income certain amounts that it collected from its customers and turned over to an advertising agency to be used for the specific purpose of national advertising. In both of those cases, the amounts *299 were collected with the prior understanding that they would be applied to a common specific purpose of the contributors. In the present case, however, the record does not establish that the membership fees and lot rentals were collected with the prior understanding that they were required to be used for a specific purpose. Accordingly, we hold that petitioner must include in gross income the membership fees and the annual lot rentals. IV. Depreciation The fourth issue for decision is whether certain land improvements constructed by petitioner are depreciable and, if so, what is the useful life of those improvements. Petitioner contends that it is entitled to depreciate the dam, lake bed and roads over a useful life of twenty years, the guideline useful life for land improvements set forth in Rev. Proc. 62-21, 1962-2, C.B. 418, 419. Respondent maintains that these improvements have indeterminate useful lives and are, therefore, not depreciable. He further asserts that Rev. Proc. 62-21 does not ascribe a twenty-year life to the land improvements in issue. Based on the limited evidence presented, we find that the dam and lake bed are depreciable improvements and that their useful *300 life is thirty years. See Fancher v. United States, an unreported case ( D.C. S. Dak., 1962, 10 A.F.T.R. 2d 5925, 62-2U.S.T.C. par. 9819); Ekberg v. United States, an unreported case ( D.C. S. Dak. 1960, 5 A.F.T.R. 2d 979, 60-1U.S.T.C. par. 9332) reversed on another issue 291 F.2d 913 (C.A. 8, 1961), certiorari denied 368 U.S. 920 (1961); and F. M. Reed, 6 B.T.A. 1140 (1927). [3] Similarly, we find that the roads are depreciable improvements and that their useful life is thirty years. L.Z. Dickey Grocery Co., 1 B.T.A. 108 (1924). V. Addition to Tax The final issue is whether petitioner is subject to the addition to tax imposed by section 6651(a) for failure to file any return on the date prescribed therefor. Respondent has added to the deficiency determined by him a twenty-five percent addition to tax based on his determination that petitioner has not filed returns within the time prescribed by law and has not shown that failure to file was due to reasonable cause. This determination is presumptively correct and in the absence of adequate proof to the contrary will be sustained. An organization applying for exemption must *301 file all returns required to be filed until the tax exempt status of the organization has been established. Section 1.6033-1(c), Income Tax Regulations.
Petitioner argues in its defense that it relied on the advice of its attorney that it was not required to file a return. Negligence on the part of an accountant or lawyer for failure to prepare a timely return does not constitute reasonable cause. The responsibility to file a timely return is on the taxpayer. Logan Lumber Co. v. Commissioner, 365 F.2d 846 (C.A. 5, 1966), affirming on this point a Memorandum Opinion of this Court. See also Knollwood Memorial Gardens, 46 T.C. 764 (1966). Petitioner further argues that petitioner's attorney began working on the returns in 1965 but they were not filed sooner because the taxation of petitioner was a complex matter. The record establishes, however, that petitioner never applied for an extension of time within which to file any of the returns nor did it file any returns as an exempt organization. Accordingly, we hold that petitioner is subject to the penalty imposed by section 6651(a). Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise indicated. ↩
2. SEC. 118. CONTRIBUTIONS TO THE CAPITAL OF A CORPORATION. (a) General Rule. - In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer. (b) Cross Reference. - For basis of property acquired by a corporation through a contribution to its capital, see section 362. ↩
3. See also Rudolph Investment Corp., T.C. Memo. 1972-129↩.