**WASHINGTON ATHLETIC CLUB,**
**Plaintiff-Appellee,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

**WASHINGTON ATHLETIC CLUB,**
**Plaintiff-Appellant,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

**Nos. 77–2853, 77–3014.**

United States Court of Appeals,
Ninth Circuit.

Feb. 28, 1980.

Gerhardt Morrison, Seattle, Wash. (argued), for plaintiff-appellee, cross-appellant; Bogle & Gates, Seattle, Wash., on the brief.

Francis J. Gould, Washington, D. C. (argued), for defendant-appellant, cross-appellee; M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Gary R. Allen, Washington, D. C., on the briefs; John C. Merkel, Seattle, Wash., of counsel.

Before COWEN,* Senior Judge, and TRASK and HUG, Circuit Judges.

COWEN, Senior Judge:

The question presented in these cross-appeals is whether certain membership fees and dues paid to the Washington Athletic Club (the club) were exempt from federal income tax as contributions to capital within the meaning of section 118 of the Internal Revenue Code of 1954.[1] The club sued in the United States District Court for the Western District of Washington seeking a refund of approximately $188,000 in federal income taxes paid for its fiscal years ending July 31, 1968, 1969, and 1970. At the pretrial conference defendant attempted to raise an offset to the club's refund claim, but the district court would not permit it to do so. The district court held that the club was entitled to a refund of the taxes on the ground that the payments in issue were contributions to capital. The decision was based on pretrial proceedings which included stipulated facts and the district court's adoption of the plaintiff's contentions on disputed facts. The club's motion for the recovery of attorneys' fees was denied. Defendant appealed from the judgment and the denial of its attempted offset, while the club cross-appealed the disallowance of attorneys' fees. We reverse the judgment of the district court and hold that the club is not entitled to the claimed refund.[2]

## I.

The Washington Athletic Club is a nonprofit[3] membership organization formed and operated for the purposes of promoting physical culture, sports, recreation, and educational and social activities which are of interest to its members. The club conducts its operations in a building located in Seattle, Washington. The building contains a gymnasium, exercise and training rooms, restaurants, lounges, meeting rooms, sleeping rooms, offices, and related facilities.

The club's organization and operations are subject to the provisions of the Washington nonprofit corporation acts,[4] and the club's articles of incorporation and bylaws. The club is governed by an elected Board of Trustees known as the Board of Governors. The Board of Governors appoints the club's officers and approves or disapproves the applications of individuals seeking membership in the club.

An individual becomes a member of the club upon the approval of his application and the payment of an initial membership fee. During the years in issue the club had seven classes of members: (1) Resident; (2) Non-resident; (3) Associate Women; (4) Senior Twenties; (5) Honorary; (6) Athletic; and (7) Special. The classes had different voting rights and privileges as follows:

(1) Resident and Senior Twenties members were entitled to full voting rights and full club privileges;

(2) Non-resident members could vote only for the non-resident members of the Board of Governors;[5]

(3) Only non-resident members from the States of Washington, Oregon and Alaska and the Province of British Columbia were eligible to serve as non-resident members of the Board of Governors;

---

* Wilson Cowen, Senior Judge, United States Court of Claims, sitting by designation.

1. All section references herein are to the Internal Revenue Code of 1954 unless otherwise indicated. Section 118 of the Code provides in pertinent part:

    "Sec. 118. CONTRIBUTIONS TO THE CAPITAL OF A CORPORATION.
    
    "(a) GENERAL RULE—In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer."

    \* \* \* \* \* \*

2. Reversal of the district court's decision renders moot both the attorneys' fee question and the offset issue.

3. During the years in issue the club was not, however, a tax-exempt organization under section 501(c) of the Code.

4. Wash.Rev.Code Ann. chapters 24.03 and 24.04.

5. The Board of Governors was composed of 27 resident members and one non-resident member for each of the 8 non-resident districts.

(4) Special, military, and clergy members had no voting rights; and

(5) Associate Women members did not have full voting rights and could not hold office except on the Women's Advisory Board.

The initial membership fees during the years in issue were: [6]

| Year | Resident | Senior Twenty | Associate | Non-resident |
|------|----------|---------------|-----------|--------------|
| 1968 | $360.00 | $90.00 | $90.00 | $90.00 |
| 1969 | $500.00 | $125.00 | $125.00 | $125.00 |
| 1970 | $500.00 | $125.00 | $125.00 | $125.00 |

The total membership and transfer [7] fees received during the years in issue were:

| Fiscal Year Ending | Amount |
|--------------------|--------|
| July 31, 1968 | $121,950.00 |
| July 31, 1969 | $156,255.00 |
| July 31, 1970 | $145,695.00 |

Members of the club, except honorary and athletic members, also paid monthly dues to the club. The amount of dues varied with the membership class as follows:

| Year | Resident | Senior Twenty | Assoc. | Non-Resident Inside | Non-Resident Distant | Firm | Special |
|------|----------|---------------|--------|---------------------|----------------------|------|---------|
| 1968 | $162.00 | $90.00 | $78.00 | $60.00 | $42.00 | $162.00 | $90.00 |
| 1969 | $162.00 | $90.00 | $78.00 | $60.00 | $42.00 | $162.00 | $90.00 |
| 1970 | $162.00 | $90.00 | $78.00 | $60.00 | $42.00 | $162.00 | $90.00 |

The total amounts received as dues during the years in issue were:

| Fiscal Year Ending | Amount |
|--------------------|--------|
| July 31, 1968 | $878,380.00 |
| July 31, 1969 | $952,233.00 |
| July 31, 1970 | $972,631.00 |

The club's bylaws provided that membership in the club could be terminated (1) by voluntary resignation, (2) by vote of the Board of Governors, or (3) for nonpayment of dues. If a membership terminated for any reason other than the dissolution of the club, the terminated member forfeited all rights in the club and was not entitled to receive any return of any portion of his membership fee or dues regardless of how long he had been a member. During the years in issue, the club's bylaws made no provision for dissolution.[8] During those years, however, members could have shared in its assets upon dissolution by the adoption of a plan of distribution as provided for in the Revised Code of Washington, sections 24.03.225 and 24.03.230.

The events giving rise to this litigation began on April 1, 1960, when the club's Board of Governors approved the establishment of a capital improvement fund for the purpose of funding the club's capital improvement programs. Monies received and allocated to the capital improvement fund during the years in issue were segregated from the club's other funds and deposited in separate savings accounts, certificates of deposit, and commercial paper. All membership and transfer fees received by the

6. While the record is not clear on this point, it appears that the other membership classes paid no membership fee.

7. A resident member, or his estate, could transfer his membership to his son on payment of a transfer fee.

8. In 1975 the bylaws were amended to provide for division of the club's assets among current members, taking into account the length of time an individual had been a member.

club were deposited in the capital improvement fund. In addition, the following amounts received as membership dues were deposited in the capital improvement fund:

| Fiscal Year Ending | Amount Deposited in Capital Improvement Fund |
| --- | --- |
| July 31, 1968 | $259,568.20 |
| July 31, 1969 | $316,302.00 |
| July 31, 1970 | $323,805.50 |

The total deposits into the capital improvement fund were:

| Fiscal Year Ending | Amount Deposited |
| --- | --- |
| July 31, 1968 | $381,518.20 |
| July 31, 1969 | $472,557.00 |
| July 31, 1970 | $469,500.50 |

The amounts allocated to the capital improvement fund were determined by the Board of Governors on the recommendations of the Finance and Budget Committee and the Executive Committee. These recommendations were based upon estimates of the need for funds to make improvements or additions to the club's facilities for the benefit of the members. The members of the club were not informed of the amounts allocated to the capital improvement fund until after the allocations had been made. Notice of the total amount of such allocations was given to the members in the annual report of the president.[9] Applicants for membership were told at the time of application that their membership fee would be allocated to the capital improvement fund. Members had no right to refuse to contribute to the capital improvement fund, and members who failed to pay their club dues lost the privileges of club membership, including the use of club facilities.

During the years in suit, sums were withdrawn from the capital improvement fund and expended on a variety of projects. It is undisputed that all expenditures from the fund were for capital improvements and

that no sums from the fund were expended on operating expenses.

## II.

### A.

As expected the parties differ sharply as to the analysis which should be used to determine the taxable status of the payments made by the club's members. Defendant reasons that since the club is not a tax-exempt organization under section 501(c) of the Code, its income is taxable in the same manner as that of other corporations. Defendant contends that the law is clear: payments to a corporation "may be treated as capital contributions, only if not intended as compensation for services, goods or the use of facilities" and that "it is the motive of the transferor that is controlling in this regard and *not* the 'use' to which the contributed funds are applied by the taxpayer." Brief for defendant at p. 12.

Washington Athletic Club responds that "a service corporation may exclude from gross income fees and dues received from its members if such fees and dues are (1) earmarked and reserved by the corporation's board of directors for capital improvements, (2) segregated from funds used for ordinary operating expenses, and (3) in fact used for capital improvements."[10] Brief for Washington Athletic Club at pp. 9–10.

In holding that the fees and dues were capital contributions, the district court emphasized the fact that the amounts withdrawn from the club's capital improvement fund were expended solely on capital improvements.

### B.

The parties have cited for our consideration a variety of decisions, including several

9. In addition, a separate letter concerning the capital improvement fund was sent to the members on December 17, 1969, by the then president of the club.

10. The test advocated by the club is commonly referred to as a "functional analysis" while the

defendant's position is often characterized as a "contributor motivation analysis." *See* Note, United States v. Chicago, Burlington & Quincy Railroad: A New Test for Nonshareholder Contributions to Capital, 27 Tax Law. 503, 505 (1974).

by the Supreme Court,[11] which have examined the nature of capital contributions for federal income tax purposes. The defendant argues that these Supreme Court decisions compel the conclusion that the motive of the transferor of the payments is controlling. The club responds that the Supreme Court cases holding adversely to the taxpayer are distinguishable, because the payments in issue in those cases were made by nonshareholders who had no interest in increasing the corporation's working capital. The club says that by contrast, the fees and dues in question here were made by club members, who are the sole owners of the club and thus are equivalent to shareholders. We find it unnecessary to decide whether this is a meaningful distinction, for we think that the doctrine of *stare decisis* requires that the rationale and the result of this court's decision in *United Grocers, Ltd. v. United States*, 308 F.2d 634 (9th Cir. 1962) be followed here.

The taxpayer in *United Grocers* was a nonprofit, cooperative membership corporation which acted as a buying, marketing, and service organization for its members, who were retail grocers. To acquire and maintain membership in the cooperative a retail grocer was required, *inter alia*, to pay a monthly fee of $7.50, which was treated by the cooperative as a contribution to capital. From its organization in 1910 until 1952, the cooperative's members had been required to make monthly payments called "dues." Since the early 1920's, the dues had been $7.50 per month and had been included in the cooperative's gross income. In 1952, however, the board of directors began treating the monthly payments as capital contributions and excluded them from gross income. Nevertheless, the members of the cooperative continued to receive the same services as before for their fees and payments. While the cooperative sold groceries to nonmembers at the same price as to members, nonmembers did not receive patronage dividends. Patronage dividends consisted of the excess of the cooperative's receipts from obtaining and delivering groceries to members over the expense of such operations. The patronage dividends resulted, in effect, in members receiving the goods and services at a lower price than nonmembers. *United Grocers* at 635–37.

The issue presented in *United Grocers* was the same as that in this case. *Id.* at 635–36. After carefully reviewing the facts and noting that a number of considerations were pertinent, this court concluded "that the motive or purpose and intent in making the contributions is a dominant factor in determining whether [the dues were] a capital contribution or payment for goods and services." *Id.* at 639. In evaluating the motive of the cooperative's members, the court declared:

> The district court correctly concluded that since members were required to make the payments in question "as a condition of the entitlement to its services, patronage dividends or otherwise," they must be held to be payments for those services unless the evidence shows that the "contributions carry other entitlements apart from the services and so characteristic of capital contributions as to negative mere payment for services as their exclusive or primary purpose." * *
>
> *Id.* at 640.

This court agreed with the district court that evidence of such other entitlements was lacking. *Id.* The opinion focused on the lack of an investment motive and emphasized two points: (1) a member who had paid dues for many years had no greater interest in the cooperative's assets upon liquidation than a new member who made only one payment, and (2) any member who withdrew prior to liquidation forfeited all rights in the assets of the cooperative. *Id.* Accordingly, the court concluded that the payments were made in order to receive reduced prices for goods and services by way of the patronage dividends and held that the payments were not capital contributions. *Id.* at 641.

---

**11.** *Detroit Edison v. Commissioner*, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286 (1943); *Brown Shoe Co. v. Commissioner*, 339 U.S. 583, 70 S.Ct. 820, 94 L.Ed. 1081 (1950); *United States v. Chicago, Burlington & Quincy Railroad*, 412 U.S. 401, 93 S.Ct. 2169, 37 L.Ed.2d 30 (1973).

There is no question here but that payment of a membership fee and dues were necessary in order for a member to use the Washington Athletic Club's facilities. The record clearly demonstrates that members who failed to pay their dues could not use the club's facilities. The fee and dues were, in other words, "a condition of entitlement" to the club's facilities. Consequently, if the fees and dues are to be treated as capital contributions, it is necessary that the members have other entitlements that are characteristic of capital contributions in order to establish that the payments were not made exclusively or primarily for the privileges and services received by the members. Our review of the relationship between the club and its members convinces us that no such other entitlements existed during the years in suit.

The members of the club could have had no investment motive for the payment of their dues and fees, because a long-term member who had paid a greater amount of dues had no greater rights on liquidation than a new member.[12] Also, just as in *United Grocers*, when his membership was terminated, he simply forfeited all amounts he had paid to the club and lost any right to share in the club's assets on liquidation. Other than access to club facilities, the only other significant right conferred by membership was that of voting for the Board of Governors. Common sense tells us that the not insignificant fees and dues here were not paid in order to gain a vote in the club's affairs. Our consideration of all the relevant facts leads to the conclusion that the dominant, if not the sole, motive for the payment of fees and dues by the members was to obtain the privilege of using the club's facilities. As a consequence, we think treatment of the payments as contributions to capital is foreclosed by the holding of *United Grocers*.

The club argues, however, that *United Grocers* is distinguishable because the cooperative in that case did not earmark the member payments for capital expenditures, whereas the Washington Athletic Club carefully segregated the dues and fees in issue and reserved them for capital improvements. Except for the club privileges they received, the club has not shown that there was any motive on the part of the members for the payments of the dues and fees. Instead, the club contends that the earmarking and reservation of the capital improvement fund, without more, qualifies the fees and dues as capital contributions. The unarticulated premise of this argument is that given the restrictions on the use to which the fees and dues could be put, the motive of the members for making the payments is irrelevant. We think that the segregation of the capital improvement fund and its expenditure solely for capital improvements is relevant to the question of whether the fees and dues were capital contributions. *See James Hotel Company v. Commissioner*, 325 F.2d 280, 283 (10th Cir. 1963). However, we do not agree with the club that it is determinative of the question.

The club relies mainly on three Tax Court memorandum decisions, *Minnequa University Club v. Commissioner*, 30 T.C.M. 1305 (1971); *Lake Forest, Inc. v. Commissioner*, 22 T.C.M. 156 (1963); and *Lake Petersburg Association v. Commissioner*, 33 T.C.M. 259 (1974), for its proposition that the earmarking and reservation of funds is the critical factor in identifying capital contributions.[13] Our reading of these cases convinces us that none of them assigns controlling importance to the earmarking and reservation of funds.

The taxpayer in *Minnequa University Club* was a nonstock corporation which ran

---

12. The club appears to argue that it is sufficient that its members had the right to share in its assets upon dissolution. This argument was rejected in *United Grocers*, 308 F.2d at 640, and the club offers no persuasive reason why it should not also be rejected here.

13. The club also cites the district court decision in *United Grocers*, 186 F.Supp. 724 (N.D.Cal.

1960), as authority for considering earmarking to be the critical determinant. We deem it sufficient to note that in our decision on the appeal from the district court, we categorized a number of the facts considered by the district court, including earmarking, as "pertinent," but not "decisive." *United Grocers*, 308 F.2d at 639.

a social club. Contrary to the facts here, the Minnequa club levied a special assessment on its members to finance certain capital improvements. The receipts from the assessment were kept in a special account and expended exclusively for the capital improvements. While the club facilities were used for a variety of membership functions, the number of nonmember functions exceeded the number of member functions, and receipts from the nonmember functions constituted 30 percent of the club's income. 30 T.C.M. at 1306–07. The Commissioner contended that the special assessment was payment for services received by the club members. *Id.* at 1310. The Tax Court rejected the Commissioner's contention and held that the assessment was a contribution to capital on the grounds that the members were equivalent to shareholders who had an investment interest in the club. *Id.* at 1309–10. The Tax Court found an investment motive in the fact that the capital improvements enabled the club to host even more nonmember functions, thereby increasing the club's income and in turn reducing membership dues. *Id.* The court distinguished two cases cited by the Commissioner on several grounds, one being that in the cases cited, there was no earmarking or restrictions on the funds in issue. *Id.* at 1310. However, the *ratio decidendi* of *Minnequa University Club* was the finding of the Tax Court that the club members had an investment interest for paying the assessments, not the fact that the funds were earmarked for capital expenditures.

In *Lake Petersburg Association*, the taxpayer, a nonprofit recreational club, was established to purchase a tract of land, build a lake on a portion of it, and subdivide the remainder into lots to be leased for 99-year terms as recreational homesites. In order to obtain a lease on a lot, an individual was required to become a member of the club and to pay a membership fee. In

addition, each member had to pay an "assessment," which was a prorata share of the cost of the land and construction of the lake and roads, and an annual lot rental fee. 33 T.C.M. at 260–61. The Commissioner contended that the club members were lessees and that the assessments were advance rental payments constituting consideration for services. *Id.* at 266. The Tax Court rejected this contention and held that the sums were capital contributions. *Id.* at 267–68. The decision turned on the court's conclusion that the club members were more analogous to shareholders in a corporation than to lessees, i. e., that an investment motive existed. *Id.* at 266–67. The court also held that the membership fees and annual lot rentals were properly included in the taxpayer's gross income. *Id.* at 268.

In *Lake Forest, Inc.*, the taxpayer was a nonprofit cooperative providing housing to its members. 36 T.C. 510, 512–13 (1961). The members made monthly payments to the corporation for operating expenses and to amortize the mortgage debt on the housing complex. *Id.* at 517, 524–25. Here, too, the Commissioner argued that the members were tenants and that the principal payments were rental income to the taxpayer. 22 T.C.M. at 163. However, the Tax Court held that the mortgage amortization payments were contributions to capital on the grounds that the members accumulated individual equities in the cooperative by virtue of such payments. *Id.*[14]

To recapitulate, none of the three Tax Court cases relied on by the club support its argument that the earmarking and reserving of funds is alone sufficient to establish that payments made by the transferors are capital contributions. Instead, each case turned on the presence of facts sufficient to convince the Tax Court of the existence of some purpose or motive for the payments by the payors other than for services. Here, however, the Washington Athletic

---

**14.** The cooperative housing cases fall in a separate category because of the special relationship between the shareholder-tenants and the cooperative. Since the equity of the shareholder-tenant is regarded as being increased by his payments which are used to amortize the cooperative's mortgage, such payments are held to be capital contributions. *See Eckstein v. United States*, 452 F.2d 1036, 1048, 196 Ct.Cl. 644 (1971).

Club has been unable to establish any other motive for the members' payments of the dues and fees to the club.

### C.

For the reasons stated, we hold that the payments in issue were not capital contributions by the club's members. Accordingly, the decision of the district court is reversed and the case is remanded with instructions to dismiss the complaint.